STATE OF NORTH CAROLINA v. JOHN DENVER POTTER

No. 58

(Filed 6 June 1978)

1. Homicide § 21.5— first degree murder—sufficiency of evidence

In a prosecution for first degree murder, evidence of defendant's earlier threats against deceased, evidence of his statements made shortly after the killing to the effect that he hoped the victim was dead, and evidence of the manner of the killing which occurred during an affray initiated by defendant who was armed against the deceased who was unarmed was sufficient to permit legitimate inferences of premeditation and deliberation to be drawn, and the trial court therefore properly denied defendant's motion for nonsuit made at the close of all the evidence.

2. Homicide § 17.2— evidence of threats—admissibility unaffected by remoteness

In a first degree murder prosecution, evidence of threats by defendant to deceased was not inadmissible on the ground that the threats were too remote, since remoteness in time of the threat does not render the evidence incompetent but goes only to its weight.

3. Homicide § 17.2— evidence of threats—no hearsay testimony

In a first degree murder prosecution, testimony by the victim's widow that she had heard that defendant had made threats against her husband was not inadmissible as hearsay, since under the facts in this case it appears such testimony was offered, not to prove that the threats were made, but simply to show the widow's knowledge of them and why she called the sheriff upon learning of defendant's presence near her home.

4. Criminal Law § 76.5— pretrial statements—voir dire to determine admissibility—necessity for findings

Where all the evidence on a voir dire to determine the admissibility of defendant's pretrial statements tended to show the appropriate waivers and that defendant was sober findings of fact were not required, although it would have been the better practice to make them.

5. Criminal Law § 86.6— defendant's pretrial statements—use for impeachment—requirements for admissibility

Where defendant's pretrial statement was offered, not as a part of the State's case in chief, but in rebuttal for the purpose of impeaching defendant's trial testimony, it was not incumbent upon the State to demonstrate that the requirements of Miranda were met as a prerequisite to admitting the statement.

6. Criminal Law § 74— defendant's pretrial statement—method of introducing

Even if defendant's pretrial statement was admitted in improper form when a deputy was permitted to read the jury a typewritten version, in question and answer form, of an interrogation of defendant which occurred shortly after his arrest, and this transcript was neither signed nor acknowledged in

State v. Potter

any way by defendant, the admission of such evidence was not prejudicial to defendant, since it was offered to impeach defendant's trial testimony, and since defendant admitted during his trial testimony that his pretrial statements were false.

**7. Criminal Law § 89.8— plea bargain arrangement—evidence properly admitted**

In a prosecution for first degree murder, the trial court did not err in allowing one defendant who withdrew his not guilty plea during trial and entered a plea of guilty to accessory after the fact to murder to testify concerning his plea bargain arrangement, since defendant was afforded full opportunity to cross-examine his codefendant with respect to his plea, and it was defendant and not the State who first introduced the fact of his codefendant's plea before the jury.

**8. Criminal Law § 120— instruction on punishment—no error**

The trial court did not abuse its discretion in instructing the jury that a life sentence would be imposed if they found defendant guilty of first degree murder.

**9. Homicide § 25.2— first degree murder—jury instructions proper**

In a first degree murder prosecution, the trial court properly instructed, in effect, that, so long as the killing was the product of premeditation and deliberation, it was murder in the first degree notwithstanding that the execution thereof might have been done while the defendant was in a state of anger, passion, or emotional excitement.

**10. Homicide § 28.2— deceased as dangerous man—jury instruction favorable to defendant**

In a first degree murder prosecution, any error of the trial court in instructing on the reputation of the deceased as a dangerous and violent man in the absence of evidence to this effect was favorable to defendant.

**11. Homicide § 28.3— first degree murder—self-defense—defendant as aggressor—instruction harmless error**

In a first degree murder prosecution, the trial court erred in instructing the jury with respect to self-defense that it must find beyond a reasonable doubt "that the defendant was not the aggressor," but such error was not prejudicial where the jury was told to consider the question whether defendant was the aggressor only insofar as this fact might render him guilty of manslaughter, and the jury found defendant guilty of murder in the first degree and therefore never reached the question whether defendant was the aggressor.

BEFORE *Gaines*, *J.*, at the February, 1977 Session of WATAUGA Superior Court and on a bill of indictment proper in form, defendant was tried and convicted of first degree murder and sentenced to life imprisonment. He appeals under General Statute 7A-27(a). This case was argued as No. 32 at the Fall Term 1977.

*Rufus L. Edmisten, Attorney General, by James Wallace, Jr., Assistant Attorney General for the State.*

*Holshouser & Lamm, by Charles C. Lamm, Jr., and J. E. Holshouser, Jr., for defendant.*

EXUM, Justice.

The state's evidence was that Ferd Snyder died as a result of a gunshot wound in his chest inflicted at close range on 25 September 1976. Its evidence also was, as defendant testifying in his own behalf admitted, that defendant intentionally inflicted this wound with a deadly weapon, to wit, a pistol. The defense was self-defense.

Defendant seeks a new trial for various errors he contends were committed below: (1) the denial of his motion for nonsuit as to murder in the first degree made at the close of all the evidence; (2) the admission of evidence of threats made by defendant against the deceased; (3) the admission of defendant's pre-trial statement made to investigating law enforcement officers shortly after his arrest; (4) the admission of a plea of guilty by his codefendant; and (5) various errors in the jury instructions, the most important of which relates to the law of self-defense. We find no error entitling defendant to a new trial.

Giving the state the benefit of every reasonable inference in its favor, as we are required to do, we find the evidence sufficient to support the submission to the jury of murder in the first degree as a possible verdict. In view of defendant's testimony in which he admitted shooting the deceased, there is no need to give in detail the state's evidence in its case in chief much of which was offered to prove, circumstantially, that defendant did in fact shoot the deceased.

Some of this evidence, however, does deserve to be considered on the question of whether there was sufficient evidence in the case to permit a jury to find that defendant shot the deceased after premeditation and deliberation. State's witness Ervin Potter, a relative of defendant, testified that in the summer of 1975 he was at defendant's residence and Ferd Snyder was at a sawmill about a half mile away sawing lumber. Defendant took a .22 caliber rifle off his wall and "said he was going to shoot Ferd

Snyder." The witness said he talked defendant "out of it," left and "told Ferd." State's witness Terry Greer, a relative by marriage of the deceased, testified that he was in defendant's residence in February or March of 1976 when he heard defendant say "a couple of times" that "he'd kill [Ferd Snyder] if he got in his way." State's witness Catherine Ellison testified that immediately after the shooting defendant came to her home with her husband, David, and told her he had shot Ferd Snyder. When she asked if he were dead, defendant said, "that he hoped that the God damned son of a bitch was dead" and that Ferd had "been giving him trouble for a long time."

Defendant testified that on 25 September 1976 he had been riding and drinking beer with David Ellison in Ellison's car since about 12:00 noon. Late in the afternoon they drove by Ferd Snyder's house, then turned around and went back by the house. There was room on the road for just one car. Ferd Snyder approached driving a pickup truck. Snyder stopped his truck blocking the path of the Ellison car. Ellison had to stop his car. Ferd Snyder got out of his truck and came quickly toward the Ellison car, jerked the passenger door open, and began cursing and calling defendant vulgar names. Snyder punched at defendant through the window. Defendant became angry, "grabbed at David's pistol" and left the car. Snyder began wrestling with him, "trying to choke me, hit me and everyting." They continued to scuffle and Snyder was getting the best of defendant. Snyder had his hands around defendant's throat and was choking him. Defendant could not breathe and became scared. Snyder "was much stronger than I was and he was getting me down on the ground and I didn't have no other choice. I tried to get him off of me for the length of David's car plumb down past his pickup, to the rear end, he had me that long. I hit him with the gun, that didn't faze him. I shot him, went back and got in David's car and went down to his house. I say I shot Ferd. I shot him in the chest, best I remember. At the time I shot him he still had a-hold of me and he was still choking me and he had me down on one knee. When I pulled the trigger on the gun, I was scared and upset." Defendant said he was five feet nine inches tall and weighed 135 to 140 pounds and was 50 years old but that he had health problems and had been operated on for ulcers in 1964. (The deceased, according to the state's medical witness who performed the autopsy, was five feet seven inches tall, weighed 146 pounds, and was an elder-

ly man.) Defendant admitted that the deceased was "substantially older than I am."

The state, in rebuttal, called David Ellison, an eye witness to the shooting.[1] Ellison testified that he stopped his car in Ferd Snyder's driveway where the driveway intersects with a rural unpaved road before he ever observed Ferd Snyder approaching. While stopped there he observed Snyder approaching in Snyder's pickup truck. Snyder stopped roughly 20 feet in front of Ellison's car. Defendant then took the pistol "off of my car seat. As he got out of the vehicle, he discharged a shot into the dash of the car." Ellison testified that the defendant "then started walking toward the Ferd Snyder truck. When he approached the truck very near it, Mr. Snyder got out, grabbed Denver by the neck, and they scuffled there for some minutes or something like that and Mr. Potter shot him." Ellison testified that at no time did Snyder approach his car. On cross-examination Ellison testified that Snyder was "choking Denver" and that "John had the gun this entire time but it was only after Ferd started choking him that he shot him." The state, also in rebuttal, recalled the witness Jerry Vaughn, a Watauga County Deputy Sheriff, who assisted in the investigation of this homicide. Vaughn testified that when defendant was questioned after his arrest regarding the homicide he denied shooting Snyder, replied that he didn't know whether or not David Ellison had shot him, that he didn't know where the pistol was but that he had told Ellison "to get rid of it."

I

[1] There is in all of this testimony ample evidence from which the jury could find that defendant killed the deceased after premeditation and deliberation. Defendant cites no authority in support of his argument to the contrary. Since premeditation and deliberation refer to processes of the mind, they must almost always be proved, if at all, by circumstantial evidence. Among circumstances which may tend to prove these elements are (1) want of provocation on the part of the deceased, (2) conduct and statments of the defendant both before and after the killing, *State v. Johnson*, 294 N.C. 288, 239 S.E. 2d 829 (1978), and (3) threats made against the deceased by the defendant, *State v.*

1. Ellison had been indicted for the murder of Snyder and was placed on trial with defendant. During the state's case in chief in the absence of the jury he entered a plea of guilty to accessory after the fact of murder.

*Stewart*, 292 N.C. 219, 232 S.E. 2d 443 (1977). Here the evidence of defendant's earlier threats against deceased, his statements made shortly after the killing, *see State v. Johnson, supra,* and the manner of the killing as described by the witness David Ellison, are enough to permit legitimate inferences of premeditation and deliberation to be drawn.

Defendant's contention on the nonsuit question seems to be essentially that the testimony of Ellison during the state's rebuttal, that Snyder was choking defendant and they were scuffling before the fatal shot was fired, negatives conclusively the existence of premeditation and deliberation. Again defendant fails to furnish us with any authority for this argument. We find it totally without merit. The thrust of Ellison's testimony was that the affray during which the deceased was shot was initiated by the defendant who, prior to entering it, armed himself with a deadly weapon. The deceased was not armed with any weapon. While other inferences may be drawn, permissible inferences from David Ellison's testimony are: defendant was looking for Ferd Snyder and waited, blocking Snyder's driveway, for Snyder to return; when Snyder returned, defendant armed himself and approached Snyder with an intention already long formed to kill him. Defendant proceeded to do just that. Defendant, of course, claimed that Snyder's truck blocked the pathway of Ellison's car in which defendant was riding. If so, his earlier threat that he would kill Snyder "if he got in his way" becomes peculiarly prophetic. *See,* for a similar prophesy fulfilled, *State v. Shook,* 224 N.C. 728, 32 S.E. 2d 329 (1944).

In short there is no merit to defendant's nonsuit argument. The charge of first degree murder was properly submitted to the jury.

## II

[2]  Defendant next argues that evidence of the threats to which Ervin Potter and Terry Greer testified was inadmissible, apparently on the ground that the threats were too remote. Defendant cites no authority to support this argument. "In homicide cases, threats by the accused have always been freely admitted either to identify him as the killer or to disprove accident or justification, or to show premeditation and deliberation." 1 Stansbury's North Carolina Evidence 547-48 (Brandis rev. 1973).

Remoteness in time of the threat does not render the evidence incompetent but goes only to its weight. *State v. Shook, supra* (nine months); *State v. Bright,* 215 N.C. 537, 2 S.E. 2d 541 (1939) (two years); *State v. Hawkins,* 214 N.C. 326, 199 S.E. 284 (1938) (almost three years).

[3] Defendant further contends there was error in the admission of the deceased's widow's testimony that she had heard that defendant had made threats against her husband. Defendant says this was hearsay. Mrs. Snyder testified that around 6:00 p.m. on the day of the killing she observed David Ellison and defendant in an automobile go by her house in one direction and then come back by in the other direction. She then ran next door to her son's house to call the sheriff. When asked why she did this she replied, "because I had heard threats that Denver [the defendant] was going to kill Ferd . . . ." Defendant objected and moved to strike this testimony. His motion was denied. Had this testimony been offered to prove the fact that defendant had made threats against the deceased, defendant's argument would be well taken. It seems clear from her testimony that Mrs. Snyder herself had not heard defendant make threats but that she had been told by others that he had made threats. We do not perceive, however, that this was the purpose for which Mrs. Snyder's testimony was offered. There was other testimony in the case, already discussed, of witnesses who had heard defendant make threats. In view of the existence of this evidence, Mrs. Snyder's testimony was offered not to prove that the threats were made but simply to show her knowledge of them and why she called the sheriff upon learning of defendant's presence near her home. As it turned out, her cause for concern was not misplaced. Offered for this purpose, the testimony was not hearsay and it was not error to admit it.

### III

Defendant next contends that certain pre-trial statements allegedly made by him to investigating officers shortly after his arrest were inadmissible because (1) the trial judge made insufficient findings regarding whether defendant had waived his privilege against self-incrimination and his right to counsel; (2) the trial court made insufficient findings regarding the defendant's mental condition on the question of the voluntariness of these

statements; and (3) the deputy sheriff who testified regarding these statements was improperly permitted to read from a typewritten transcript.

[4] During the state's case in chief, the trial judge conducted a voir dire to determine the admissibility of the pre-trial statements. There was evidence on the voir dire that full *Miranda* warnings were given the defendant after his arrest and before he was interrogated. Defendant was asked if he understood his rights and he replied that he did. He was asked whether he wanted a lawyer, and he answered negatively. There was evidence that he was not under the influence of alcohol or drugs at the time of his interrogation and that no threats were made against him. There was also evidence brought out on cross-examination of the interrogating officer that he smelled alcohol on defendant's breath. There was no evidence, however, that defendant was at that time intoxicated or under the influence of alcohol. The trial judge failed to find expressly that defendant had waived his privilege against self-incrimination and his right to counsel and failed to make any finding as to defendant's sobriety. Inasmuch as all the evidence tended to show the appropriate waivers and that defendant was sober, such findings were not required, although the better practice is to make them. *State v. Lynch*, 279 N.C. 1, 15, 181 S.E. 2d 561, 570 (1971).

[5] We note, further, that in this trial defendant's statement was offered, not as a part of the state's case in chief, but in rebuttal for the purpose of impeaching defendant's trial testimony. So offered, it was not incumbent upon the state to demonstrate that the requirements of *Miranda* were met as a prerequisite to admitting the statement. *Harris v. New York*, 401 U.S. 222 (1971).

[6] The more difficult problem is the manner in which defendant's pre-trial statement was offered and arises from the following: The record shows that Deputy Sheriff Vaughn, testifying on rebuttal, read for the jury a typewritten version, in question and answer form, of an interrogation of defendant which occurred shortly after his arrest. This transcript was neither signed nor acknowledged in any way by defendant. Defendant's counsel had been furnished a copy of it prior to trial. Defendant's answers to the questions were essentially exculpatory in the sense that he consistently denied shooting Ferd Snyder. Insofar

as these pre-trial statements are inconsistent with the defendant's trial testimony they tend, of course, to impeach his credibility as a witness. His pre-trial statements, though, do not amount to a confession.

Nevertheless a witness should not be permitted to read from a written transcript unless the transcript itself is admissible as an exhibit. *State v. Walker*, 269 N.C. 135, 139, 152 S.E. 2d 133, 137 (1967). Under circumstances similar to but distinguishable from those here, the state in *Walker* put up investigating officers who purported to read verbatim from a pre-trial statement made by the defendant which had been reduced to writing but which the defendant, according to all the evidence, had signed but never read. The Court said, 269 N.C. at 140, 152 S.E. 2d at 137-38:

> "Although it would be permissible for Sergeant Melton or Detective Belvin to refer to a memorandum prepared by him for the purpose of refreshing his recollection as to statements made by defendant, their personal sworn testimony would be the only competent substantive evidence. Under the circumstances, the verbatim reading to the jury of the typed statements was not competent substantive evidence of the matters set forth therein."

*Compare*, however, *State v. Cole*, 293 N.C. 328, 334, 237 S.E. 2d 814, 818 (1977), which distinguished *Walker* on the grounds that the transcript of defendant's pre-trial statements in *Cole* purported to be the actual words of the accused. A similar distinction was made in *State v. Fox*, 277 N.C. 1, 25, 175 S.E. 2d 561, 576 (1970), where the Court said, "[T]here is no requirement that an oral confession be reduced to writing or that the oral statement, after transcription by another, be signed by the accused."

Whether the transcript from which Deputy Sheriff Vaughn read purported to be a *verbatim* rendering of defendant's statements was explored to some extent at trial. Vaughn testified on cross-examination that the transcript was typed by a secretary from his longhand notes which in turn were prepared the day after the interview from more cryptic notes which he had made while the interview was in progress. The deputy said, "It's entirely possibly that this is by no means word for word."

Even if the reading of this transcript by Vaughn was error, it was not prejudicial to defendant. In *Walker* the statement erroneously read into evidence was characterized by this Court as a

"devastating confession" relied on by the state "as substantive evidence of the crucial element of [defendant's] guilty knowledge." Here defendant's statements were not a confession. In essence they were exculpatory. They were introduced by the state for the purpose of impeaching defendant's trial testimony. Most importantly defendant himself during his trial testimony, while denying some of the statements attributed to him, admitted that when he was questioned by Deputy Vaughn and others he did not tell them the truth about what happened. He said:

> "I told these officers on the night I was arrested that I hadn't even been near the Ferd Snyder house because I didn't tell them the truth. I did not tell them that I had urged those four people if they got any interference to kill Ferd Snyder. I told this officer that I didn't shoot Ferd Snyder. I was not telling him the truth when I told him that I did not shoot Ferd Snyder, I was wanting to talk to a lawyer before I told him everything I knowed. I didn't tell him the truth when I said we haven't been about Ferd Snyder's house today. I told you a time or two I told it wrong."

Defendant having admitted not telling the truth to the officers when they questioned him, Deputy Vaughn's testimony essentially to the same effect, even if offered in improper form, was not prejudicial.

IV

Both defendant and David Ellison were indicted separately for the murder of Ferd Snyder. The state's motion to consolidate the case for trial was allowed over defendant's objection. During the course of the trial against both men and about midway through the state's case in chief, in the absence of the jury, David Ellison withdrew his not guilty plea and entered a plea of guilty to accessory after the fact to murder. The plea was accepted and the court forthwith entered judgment placing David Ellison on probation for five years.

David Ellison, as previously noted, then became a key witness for the state. On cross-examination of this witenss defendant, through counsel, elicited this testimony:

> "I was in this trial as a defendant up until yesterday and I made a deal with the state yesterday and I entered a plea to a lesser offense on a plea bargain arrangement."

The nature and terms of the suspended sentence were then described in detail by the witness, still under cross-examination. On redirect under questioning by the state the witness, over objection, was permitted to testify:

> "I, in fact, have pled guilty to the crime of accessory after the fact of murder by assisting John Denver Potter, driving him away and by disposing of a .38 caliber pistol that he had used."

Defendant assigns as error the admission of this last statement by Ellison and the consolidation of the cases for trial.

There is clearly no error in the consolidation. Both defendant and Ellison were indicted for the same offense. The cases against them were joinable for trial pursuant to General Statute 15A-926(b)(2).

[7] Neither do we find error in admitting the testimony of Ellison. Defendant on cross-examination brought out that Ellison had been treated leniently by the court in return for his plea of guilty "to a lesser offense" and, defendant sought to imply, for his testimony against defendant. It was proper then for the state to place before the jury in bolder relief that crime to which Ellison had pleaded and for which he had been sentenced in order to show, or at least to be in a position to argue that, under the circumstances, the sentence imposed did fit the crime.

Further, defendant had ample opportunity by cross-examination of Ellison to test the factual basis for his plea. This case is thus unlike *State v. Kerley*, 246 N.C. 157, 97 S.E. 2d 876 (1957), where a nontestifying codefendant entered a plea of *nolo contendere* during the trial and the prosecuting attorney argued this fact to the jury against the defendant, who maintained his not guilty plea. This Court in *Kerley*, recognizing the rule that a codefendant's plea of guilty is not competent against a defendant then on trial, held the prosecutor's argument to be prejudicial error. The present case is more like *State v. Bryant*, 236 N.C. 745, 73 S.E. 2d 791 (1953), and *State v. Cameron*, 284 N.C. 165, 200 S.E. 2d 186 (1973). In *Bryant* an accomplice named Ransom, who was not on trial, testified against defendant. After the trial court's instructions to the jury but while they were still in the box, the district attorney announced that the accomplice, in the case

against him, had entered a plea of guilty. Defendant immediately moved for mistrial. The trial court instructed the jurors that if they had heard the announcement of the district attorney they should disregard it. He denied the motion for mistrial. This Court held the denial was not error saying, "Ransom had just been on the witness stand and testified to facts which clearly disclosed his participation in the crime for the commission of which the defendant was then on trial. The jury was already fully apprized of his guilt." 236 N.C. at 747, 73 S.E. 2d at 792. In *Cameron* an accomplice who was not on trial testified against defendant. During his testimony the state brought out on redirect examination that the witness intended to plead guilty to the charges against him. This Court found no error, saying, 284 N.C. at 170, 200 S.E. 2d at 190:

> "In instant case, defendant was not deprived of his constitutional rights of confrontation and cross-examination. The record does not reflect any argument to the jury by the Solicitor concerning the witness' intent to enter a plea of guilty. Further, in view of the witness' sworn testimony, which amounted to a detailed and unequivocal admission of his guilt, we are unable to perceive how a statement of his intention to confirm this sworn, public confession by a subsequent plea of guilty could be prejudicial error."

In the case at bar Ellison, while initially on trial as a codefendant, did in his testimony given after his plea was entered detail his participation, such as it was, in the shooting. Defendant was afforded full opportunity to cross-examine him; and it was defendant, not the state, who first introduced the fact of Ellison's plea before the jury.

## V

[8] The defendant assigns various errors to the jury instructions given by the trial court. The first is to the instruction that, "You may find the defendant guilty of murder in the first degree *in which event a life sentence would be imposed.*" (Emphasis supplied.) The court made this statement in the course of giving the jury the four possible verdicts it could return. Defendant complains of the italicized portion. We see no error prejudicial to defendant in this statement. *See State v. McMorris*, 290 N.C. 286, 291, 225 S.E. 2d 553, 556 (1976), where we said, "it could hardly be

error" for a trial judge to so inform the jury in a case in which a guilty verdict mandated a life sentence. Normally defendants complain when juries are not so informed. *See State v. Wilson*, 293 N.C. 47, 235 S.E. 2d 219 (1977); *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). In *Wilson*, 293 N.C. at 58, 235 S.E. 2d at 225, we said:

> "The trial judge is *not required* to instruct the jury that upon conviction a sentence of life imprisonment will be imposed. *See State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977); *State v. McMorris, supra; State v. Rhodes, supra.* Such an instruction may be given or withheld in his discretion and the exercise of that discretion will not, absent abuse, be disturbed on appeal. *State v. Bumper*, 275 N.C. 670, 170 S.E. 2d 457 (1969); *Welch v. Kearns*, 261 N.C. 171, 134 S.E. 2d 155 (1964)." (Emphasis original.)

No abuse of discretion is shown here.

Next defendant complains about certain alleged misstatements of fact by the judge when he recapitulated the evidence. We have examined these closely. Not all are misstatements. Those which are misstatements are not material but constitute at most slight inaccuracies. None were called to the attention of the trial judge. An example of the kind of misstatement relied on was this instruction: "The state also offered Mr. Main and Mr. Ervin Potter and Mr. Larry Greer who testified as to prior threats which the defendant, Potter, had made against Mr. Ferd Snyder." Only the witnesses Potter and Greer testified about such threats. We are satisfied that the adjective phrase beginning with "who" was intended to refer only to these two witnesses. Even if it were understood by the jury to refer to all three witnesses, this is the kind of inaccuracy which must be called to the trial court's attention in time for a correction to be made in order to take advantage of it on appeal. *Compare State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds* 432 U.S. 233 (1977); *State v. Goines*, 273 N.C. 509, 160 S.E. 2d 469 (1968), and cases there cited, holding similar inaccuracies to be unavailing on appeal where not objected to at trial, with *State v. Barbour*, 295 N.C. 66, 243 S.E. 2d 380 (1978) (No. 36, Spring Term 1978, filed 8 May 1978); *State v. Frizzelle*, 254 N.C. 457, 119 S.E. 2d 176 (1961); and *State v. Revis*, 253 N.C. 50, 116

State v. Potter

S.E. 2d 171 (1960), holding misstatements of fact to be material and prejudicial even though not called to the judge's attention at trial.

[9] Defendant next assigns as error the following instruction which the court gave in explaining the element of deliberation:

> "Fifth, that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose not under the influence of some suddenly aroused violent passion it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect."

We believe this to be a correct statement of the law. It means that so long as the killing was the product of premeditation and deliberation it is murder in the first degree notwithstanding that the execution thereof might have been done while the defendant was in a state of anger, passion, or emotional excitement. This Court in *State v. Faust*, 254 N.C. 101, 108, 118 S.E. 2d 769, 773 (1961), quoted with approval from 40 C.J.S. Homicide § 33(d) (1944) as follows: "If the design to kill was formed with deliberation and premeditation, it is immaterial that defendant was in a passion or excited when the design was carried into effect." *See also* N.C.P.I.—Crim. 206.10.

Defendant's challenges to other instructions, essentially those relating to self-defense, arise in the following context. Briefly, the trial judge told the jury it could return one of four possible verdicts: guilty of first degree murder, second degree murder, voluntary manslaughter, or not guilty. He defined each degree of homicide and the elements thereof. He told the jury that in order to convict the defendant of first degree murder, the state must prove five things beyond a reasonable doubt: (1) defendant "intentionally and without just cause or excuse and with malice shot Ferd Snyder with a deadly weapon," correctly thereafter defining the term malice; (2) the shooting was a proximate cause of Ferd Snyder's death; (3) defendant intended to kill Ferd Snyder; (4) defendant acted "after premeditation," correctly defining this term; and (5) defendant acted "with deliberation," correctly defin-

ing this term. He then properly explained second degree murder, voluntary manslaughter and the difference between these degrees of homicide.

Going then to the elements of self-defense the trial judge said in part (defendant assigns as error the italicized portions):

"It is for you, the jury, to determine the reasonableness of the defendant's belief from the circumstances as they appeared to him, and in making this determination you should consider the circumstances as you found them to have existed from the evidence including the size, age, and strength of the defendant as compared to Ferd Snyder. The fierceness of the assault, if any, upon the defendant by Ferd Snyder, and whether or not Ferd Snyder had a weapon in his possession. *You may also, ladies and gentlemen of the jury, consider the reputation of Ferd Snyder for danger and violence in making this consideration.*

*"Third, ladies and gentlemen of the jury, you must find by the evidence and beyond a reasonable doubt and to a moral certainty that the defendant was not the aggressor . . . ."*

*"Fourth, ladies and gentlemen of the jury, the defendant did not use excessive force, that is, more force than reasonably appeared to be necessary to the defendant at the time.*

"Again, ladies and gentlemen of the jury, it is for you, the jury, to determine the reasonableness of the force used by the defendant under all the circumstances as they appeared to him, that is, to the defendant, John Denver Potter, at the time."

"Ladies and gentlemen of the jury, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. However, if the State proves beyond a reasonable doubt that the defendant, though otherwise acting in self-defense, used excessive force or was the aggressor though he had no murderous intent when he entered the fight, the defendant would be guilty of voluntary

manslaughter. If you do not find the defendant guilty of murder or voluntary manslaughter, you must find the defendant not guilty."

The trial judge concluded his substantive instructions as follows (defendant assigns as error the italicized portions):

*"Ladies and gentlemen of the jury, I charge you that if you find from the evidence beyond a reasonable doubt that on or about the 25th day of September, 1976 John Denver Potter intentionally and without justification or excuse shot Ferd Snyder with a .38 caliber pistol thereby proximately causing Ferd Snyder's death, and that John Denver Potter intended to kill Ferd Snyder, and that he acted with malice after premeditation and after deliberation, it would be your duty to return a verdict of guilty of first degree murder.*

"However, if you do not so find or after considering and weighing all of the evidence you have a reasonable doubt as to one or more of these things you will not return a verdict of first degree murder. If you do not find the defendant guilty of first degree murder you must determine whether he is guilty of second degree murder.

"I charge you, ladies and gentlemen of the jury, if you find from the evidence beyond a reasonable doubt that on or about the 25th day of September, 1976 John Denver Potter intentionally and with malice and without justification or excuse shot Ferd Snyder with a deadly weapon, to wit, a .38 caliber pistol thereby proximately causing Ferd Snyder's death, it would be your duty to return a verdict of guilty of second degree murder. However, if you do not so find or have a reasonable doubt as to one or more of these things, you will not return a verdict of guilty of second degree murder. If you do not find the defendant guilty of second degree murder you must consider whether he is guilty of voluntary manslaughter.

*"If you find from the evidence, ladies and gentlemen of the jury, and beyond a reasonable doubt and to a moral certainty that on the 25th day of September, 1976 John Denver Potter intentionally and without justification or excuse shot Ferd Snyder with a .38 caliber pistol, a deadly weapon,*

*thereby proximately causing Ferd Snyder's death, but the State has failed to satisfy you beyond a reasonable doubt that the defendant killed with malice because of the heat of passion or that he was the aggressor although without murderous intent in bringing on the dispute with Ferd Snyder, or that while exerting the right of self-defense he used excessive force, then in that event it would be your duty to return a verdict of guilty of voluntary manslaughter.*

"However, if you do not so find or have a reasonable doubt as to one or more of these things, you will not return a verdict of guilty of voluntary manslaughter. On the other hand, ladies and gentlemen of the jury, the Court charges you and instructs you that the killing would be justified on the grounds of self-defense, and it would be your duty to return a verdict of not guilty if, under the circumstances as they existed at the time of the killing, the State has failed to satisfy you beyond a reasonable doubt of the absence on the part of John Denver Potter of a reasonable belief that he was about to suffer death or serious bodily harm at the hands of Ferd Synder, or that John Denver Potter used more force than reasonably appeared to him to be necessary, or that John Denver Potter was the aggressor.

"If you do not find the defendant guilty of either murder as I have charged you, that is, either first degree murder or second degree murder, and if you do not find the defendant guilty of voluntary manslaughter, it would be your duty then, ladies and gentlemen of the jury, to return a verdict of not guilty."

[10] Defendant contends there was no evidence regarding the reputation of Ferd Snyder for being a dangerous and violent man; therefore it was error to instruct the jury to consider this reputation in determining whether defendant acted in self-defense. If so, we hardly see how the statement could have prejudiced defendant. If error, it is favorable to defendant.

[11] We concede it was error to tell the jury it must find beyond a reasonable doubt "that the defendant was not the aggressor." It would have been proper, as we think the trial judge was trying to

do in this portion of his instructions, to tell the jury that the killing of Ferd Snyder would be excused altogether as being in self-defense if:

(1) it appeared to defendant and he believed it to be necessary to shoot Ferd Snyder in order to save himself from death or great bodily harm, *State v. Deck*, 285 N.C. 209, 203 S.E. 2d 830 (1974); *and*

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, *State v. Ellerbe*, 223 N.C. 770, 28 S.E. 2d 519 (1944); *and*

(3) defendant was not the aggressor in bringing on the affray, defining what is meant by this term, *State v. Wynn*, 278 N.C. 513, 180 S.E. 2d 135 (1971); *and*

(4) defendant did not use excessive force, defining what is meant by this term. *State v. Woods*, 278 N.C. 210, 179 S.E. 2d 358 (1971).

There is no error, consequently, in the judge's instructions on the fourth element of the doctrine of self-defense. None of these elements, however, must be found to exist beyond a reasonable doubt. Indeed, as the trial judge correctly stated immediately following the instructions complained of, the burden was on the state to prove beyond a reasonable doubt that defendant did *not* act in self-defense, there being evidence in the case that he did. *State v. Hankerson, supra*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds* 432 U.S. 233 (1977).

This means that defendant is to be found not guilty unless the state proves beyond a reasonable doubt:

(1) Defendant did not believe it to be necessary to shoot Ferd Snyder in order to save himself from death or great bodily harm, *or*

(2) If he did believe this, his belief under the circumstances as they appeared to him at the time was unreasonable, *or*

(3) The defendant was the aggressor, *or*

(4) The defendant used excessive force.

Such in essence was correctly given by the judge as his concluding substantive instruction.

While the instruction on the third element of the doctrine of self-defense relating to whether defendant was the aggressor was erroneous, we believe it to be harmless beyond a reasonable doubt inasmuch as defendant was convicted of murder in the first degree. The jury never reached the question whether defendant was the aggressor or, if it did, the answer would have been immaterial. It would have reached this question or the question would have been material only in determining whether defendant was guilty of voluntary manslaughter or not guilty. One who kills under a reasonable belief that it is necessary to do so to save himself from death or great bodily harm will not be entirely excused on the ground of self-defense if he is the aggressor, that is, if he "aggressively and willingly enters into a fight without legal excuse or provocation." *State v. Wynn, supra,* 278 N.C. at 519, 180 S.E. 2d at 139. An accused who, though otherwise acting in self-defense, is the aggressor in bringing on the affray is guilty at least of voluntary manslaughter. The defendant, under such circumstances, "loses the benefit of perfect self-defense." *State v. Watson,* 287 N.C. 147, 154, 214 S.E. 2d 85, 90 (1975). "[A] defendant, prosecuted for homicide in a difficulty which he has himself wrongfully provoked, may not maintain the position of perfect self-defense unless, at a time prior to the killing, he had quitted the combat . . . ." *State v. Crisp,* 170 N.C. 785, 790, 87 S.E. 511, 513 (1916).[2]

---

2. A person is considered to be an aggressor under this rule whenever he "has wrongfully assaulted another or committed a battery upon him" or when he has "provoked a present difficulty by language or conduct towards another that is calculated and intended to bring it about." *State v. Crisp,* cited in text. If, of course, one brings about an affray with the intent to take life or inflict serious bodily harm, he is not entitled even to the doctrine of imperfect self-defense; and if he kills during the affray he is guilty of murder. "[I]f one takes life, though in defense of his own life, in a quarrel which he himself has commenced with intent to take life or inflict serious bodily harm, the jeopardy in which he has been placed by the act of his adversary constitutes no defense whatever, but he is guilty of murder. But, if he commenced the quarrel with no intent to take life or inflict grievous bodily harm, then he is not acquitted of all responsibility for the affray which arose from his own act, but his offense is reduced from murder to manslaughter." *State v. Crisp,* cited in text, 170 N.C. at 793, 87 S.E. 2d at 515. In this case the trial judge never instructed the jury on the theory that defendant may have been the aggressor with murderous intent in bringing on this affray although the evidence would have supported such an instruction. This omission was in favor of defendant. Had such an instruction been given, however, the error committed here might have been prejudicial. The jury here was told to consider the question whether defendant was the aggressor only insofar as this fact might render him guilty of manslaughter rather than not guilty.

Under the instructions here given the jury was told to find defendant guilty of voluntary manslaughter if it found that, although he otherwise acted in self-defense, i.e., under a reasonable belief that it was necessary to kill in order to save himself from death or great bodily harm, he was the aggressor in bringing on the affray.

The jury was told to consider first whether defendant was guilty of first degree murder. Only if it could not so find was it to consider his guilt of second degree murder, or in turn, manslaughter. Having found defendant guilty of first degree murder, it must have found beyond a reasonable doubt that defendant killed without just cause or excuse, with malice, specifically intending to kill the deceased, after premeditation, and with deliberation. Without justification or excuse, as an essential element of first degree murder means the absence of either of the first two elements of self-defense. Malice, likewise, not only means ill will, hatred or spite, sometimes called "express malice," but also "exists as a matter of law 'whenever there has been an unlawful and intentional homicide without excuse or mitigating circumstance.' *State v. Baldwin*, 152 N.C. 822, 829, 68 S.E. 148, 151 (1910)." *State v. Patterson*, 288 N.C. 553, 559, 220 S.E. 2d 600, 606 (1975), *death penalty vacated* 428 U.S. 904 (1976). The judge here, in essence, so instructed the jury saying:

> "Now, ladies and gentlemen of the jury, malice means not only hatred, ill will or spite as it is ordinarily understood. To be sure, that is malice. But it also means that condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict a wound with a deadly weapon upon another which proximately results in his death without just cause, excuse or justification."

Thus by finding both that the killing was without just cause or excuse and with malice beyond a reasonable doubt the jury must have found either that the defendant did not believe it was necessary to kill Ferd Snyder in order to save himself from death or great bodily harm, or, if he did, such a belief was not reasonable under the circumstances. Having so found they never under the instructions as given reached the question whether defendant was the aggressor in bringing on the affray, or if they did reach it, the answer became immaterial. Any error in the instruction on the aggressor issue must perforce have been

harmless. For analogous holdings *see State v. Freeman*, 275 N.C. 662, 170 S.E. 2d 461 (1969); *State v. Lipscomb*, 134 N.C. 689, 47 S.E. 44 (1904); *State v. Munn*, 134 N.C. 680, 47 S.E. 15 (1904).

We find no error in the fourth italicized portion of the complained of instructions dealing with murder in the first degree. It is a correct statement of the law. *See State v. Davis*, 289 N.C. 500, 510, 223 S.E. 2d 296, 302 (1976), *death penalty vacated* 429 U.S. 809 (1976); *State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968).

The last italicized portion of the instructions complained of deals with circumstances under which the jury could find defendant guilty of manslaughter. The instruction does seem confusing. Does it mean that, the state having failed to prove malice but having proved the absence of justification or excuse, the jury would find defendant guilty of manslaughter if the state also failed to prove that defendant was the aggressor or that he used excessive force? If so, the instruction is nonsensical. What the trial judge was apparently trying to say is that the jury would return a verdict of guilty of manslaughter if: (1) the state, having proved an intentional killing without justification or excuse, nevertheless failed to prove malice because it failed to prove that defendant did not act in the heat of passion on adequate provocation; or (2) the state failed to prove that defendant was not acting in self-defense, but proved he was the aggressor or used excessive force. Because the jury convicted defendant of murder in the first degree, whatever confusion might have resulted because of these instructions relating to manslaughter was harmless beyond a reasonable doubt for the reasons we have already given.

In summary, we find defendant has had a fair trial free from prejudicial error.

No error.