STATE OF NORTH CAROLINA v. JAMES H. BERRY

No. 62

(Filed 29 August 1978)

1. **Criminal Law § 90— no impeachment by State of own witness**

The State did not impeach its own witness when an eleven-year-old witness first testified that he did not see defendant on the day in question and did not know him, the district attorney conferred with the witness in private, and the witness was recalled and testified that, on the day of the shooting, he saw defendant take a gun out of a truck, load it, and walk out of sight, and that he thereafter heard "shots," since whatever initial confusion existed in the witness's mind was apparently dissipated during the conference with the district attorney, and the State did not attempt to discredit any testimony which the witness gave after being recalled.

2. **Criminal Law § 87.1— leading question—youthful witness**

The district attorney was properly allowed to ask an eleven-year-old witness several leading questions on direct examination when the witness had difficulty understanding questions because of his age or immaturity.

3. **Criminal Law § 99.5— instruction to counsel not to interrupt witness—no expression of opinion**

The trial judge did not express an opinion in violation of G.S. 1-180 when he sustained the State's objection to defense counsel's interruption of a witness, instructed defense counsel to let the witness finish his answer, and responded in the negative when defense counsel complained that the witness was "throwing in something extra besides what I'm asking him."

---

State v. Berry

---

4. **Homicide § 24.1— instructions—presumptions of unlawfulness and malice**

The trial court's instruction that the jury could infer that a killing was unlawful and with malice if the State proved beyond a reasonable doubt that defendant intentionally killed deceased with a deadly weapon or intentionally inflicted a wound upon deceased with a deadly weapon that proximately caused his death comported with the decision of *Mullaney v. Wilbur*, 421 U.S. 684 and was not improper.

5. **Homicide § 32.1— definition of involuntary manslaughter—error cured by verdict of first degree murder**

Defendant was not prejudiced by the trial court's instruction erroneously defining involuntary manslaughter as the "intentional," rather than "unintentional," killing of a human being by an unlawful act not amounting to a felony where defendant was convicted by the jury of first degree murder.

6. **Criminal Law § 130— motion for mistrial—communications with jury**

The trial judge did not err in failing on his own motion to declare a mistrial "for improper communication with the jury during deliberations" where the jury, during its deliberations, opened the jury room door and requested that it be allowed to review a certain exhibit, the bailiff reported this request to the trial judge, and the trial judge then properly instructed the jury on the point.

7. **Constitutional Law § 28— due process—hostile audience—admonishing audience to be quiet**

Defendant was not denied due process because of hostile sentiment against him by the courtroom audience during the trial where the record shows only three instances where the trial judge admonished those present in the courtroom to be quiet.

BEFORE *Small, J.,* at the 28 February 1977 Criminal Session of WASHINGTON Superior Court and on a bill of indictment proper in form, defendant was tried and convicted of first degree murder and sentenced to life imprisonment. He appeals under General Statute 7A-27(a). This case was argued as No. 53 at the Fall Term 1977.

*Rufus L. Edmisten, Attorney General, by James E. Magner, Jr., Assistant Attorney General, for the State.*

*LeRoy Scott and Stephen A. Graves, Attorneys for Defendant.*

EXUM, Justice.

Defendant brings forward six assignments of error relating to the admission of evidence, incidents in the courtroom that defendant claims improperly influenced the jury, and the instructions to the jury. We find no error entitling defendant to a new trial.

The state offered evidence tending to show that on 12 December 1976 Willie Lee Moore, Alton Norman and defendant were playing poker at the Shady Rest Inn, a business Moore operated near Plymouth. An argument over the poker game arose between Norman and defendant, and they went outside for about five minutes. Norman came back inside and walked over to a counter where some men were talking together. Defendant went to his truck, took out a rifle, loaded it, and came back inside with the rifle. He said, "I want my money," whereupon Norman grabbed Andy Barnes, age fifteen, and held him as a shield while he backed behind the counter. Norman then shoved Andy Barnes under the counter. Defendant immediately fired two or three shots at Norman, who fell face down on the floor.

After the shots were fired, Moore came over to Norman, shook him and said, "Berry, I believe you killed that man." Defendant denied it and then said, "Now I'm going to shoot you because you'll call the cops." Moore and defendant struggled over the rifle until James Johnson came to Moore's assistance and wrested the rifle away from defendant.

Police were summoned to the scene of the shooting. On arrival they found Norman inside, lying face down in a pool of blood, a .22 caliber rifle with a scope propped against the wall, two .22 caliber cartridges on the floor, and a .38 caliber pistol on top of a refrigerator. James Johnson identified the rifle at trial as the one he had taken from defendant.

Norman was taken to the hospital and subsequently pronounced dead. An autopsy showed the cause of death to have been a gunshot wound to the left forehead. One .22 caliber bullet was removed from his brain.

Special Agent Frank Satterfield of the State Bureau of Investigation testified as an expert in firearms identification. In his opinion the two cartridges found on the floor at the scene of the shooting were fired from the rifle taken from defendant.

Defendant testified that he had won about $60 in the poker game with Moore and Norman. On the last hand, which defendant won, Norman grabbed the pot and said, "You won't get this damn money . . . . You want to fight about it?" Defendant replied that he did not. Defendant picked up $5.00 Norman had left on the table and started to walk out. Looking behind him, he saw Norman pointing a gun at his back. Defendant became frightened,

State v. Berry

walked to his truck and took out his rifle to "scare off" Norman. Norman ran back inside and defendant followed to demand his money. He walked toward the spot where Moore was standing. Norman suddenly "come up from behind the bar" and shot at defendant. As defendant pointed his rifle in the direction of the shot, Moore grabbed the barrel and the weapon discharged.

Defendant denied he had loaded his rifle when he took it from the truck and insisted he had no intention of harming Alton Norman. He also testified that the rifle fired only once.

[1] By his first assignment of error defendant challenges the admission into evidence of the testimony of state's witness Kelvin Ray Perkins. Perkins was an eleven year old boy who testified, in essence, that on the day of the shooting he, while playing near the Shady Rest Inn, observed defendant take a "long" gun out of a truck, load it, and walk with the gun away from the truck "around the house" and out of view. After observing this incident, Perkins testified, he heard "shots."

When Perkins was first called to the stand, he testified that he had not seen defendant on the day in question and did not know him. The record reflects only that Perkins was immediately "recalled" as a witness and then gave the testimony of which defendant now complains. All the record reveals about what transpired in the hiatus between Perkins being first called as a witness and then being "recalled" is given in his testimony during cross-examination by defendant:

> "Yes sir, I do remember when I first went on the stand that Mr. Griffin [the district attorney] asked me if I saw Mr. Berry at any time on December 12, 1976. Yes sir, I do remember I told him no. Yes sir, that is right.

> "Yes sir, then I went back in the back room and talked to Mr. Griffin and Mr. Young. Mr. Young, the one without the glasses talked to me. Yes sir, I talked to him. We talked about Mr. Berry. Mr. Young asked me did I see Mr. Berry on December . . . No sir, I cannot finish. I don't even know."

Defendant says in his brief that after Perkins initially denied seeing or knowing defendant, "[t]he District Attorney requested and was granted a short recess. During this recess, the District Attorney, along with SBI Agent Lewis Young, conferred with Kelvin Ray Perkins in private. After the recess, Kelvin Ray

Perkins was recalled to the witness stand and testified to seeing the defendant on December 12, 1976, and proceeded to describe the events of that day." We do not know why Perkins initially made statements that seem to conflict with this testimony upon being recalled. On this record it is probable that, as a result of his youth and his unfamiliarity with courtroom surroundings, he simply became confused upon taking the stand and failed to apprehend that "the defendant, James Berry," as the question was first put, was the same person he thereafter identified as "the man sitting down there at the end of the table, the man with the glasses," as the question was subsequently put. In all likelihood the purpose of the recess and conference with the witness was to clear up, if possible, this confusion. In any event defendant did not object at trial, nor does he complain of the recess or what transpired during it.

Defendant complains here rather of the state's being permitted to "impeach" this witness by asking him leading questions. This, however, is not a case where the state attempted to impeach its own witness. Whatever initial confusion existed in the witness' mind was apparently dissipated during the out-of-court conference with the district attorney. There was no attempt by the state to discredit any testimony which this witness gave after being recalled.[1] The jury, furthermore, was fully apprised of the fact of the conference and the manner in which the witness gave his testimony.

[2] It is true that the trial judge did permit several leading questions during Perkins' direct examination. Most of the questions, however, were not leading, and the trial judge was alert to sustain an objection to a question which he deemed to be unnecessarily leading.[2] "[I]t is firmly entrenched in the law of this

---

1. *Compare State v. Pope,* 287 N.C. 505, 215 S.E. 2d 139 (1975) in which the State did attempt impeachment of one of its witnesses by showing prior statements made by the witness inconsistent with his trial testimony. The rules regarding this kind of impeachment are ably discussed therein in an opinion by Chief Justice Sharp.

2. A representative sample of the direct examination is reproduced in the record as follows:

"Q. After the truck backed out of Mrs. Moore's driveway, what did you see then?

MR. SCOTT: Objection.

COURT: Overruled.

A. Took out his gun.

. . . .

"Q. After you saw the gun, what did you see then? Did you see what he did with the gun?

MR. SCOTT: Objection.

State v. Berry

State that it is within the sound discretion of the trial judge to determine whether counsel shall be permitted to ask leading questions, and in the absence of abuse the exercise of such discretion will not be disturbed on appeal." *State v. Greene*, 285 N.C. 482, 492, 206 S.E. 2d 229, 235 (1974); *accord, State v. Cobb*, 295 N.C. 1, 243 S.E. 2d 759 (1978). It is usually permissible to lead a witness on direct examination when the witness has difficulty in understanding questions because of age or immaturity. *State v. Greene, supra; State v. Payne*, 280 N.C. 150, 185 S.E. 2d 116

COURT: Overruled.

A. Loaded it up.

. . . .

"Q. What direction, what direction was he going in at the time you saw him going around the side of the house?

MR. SCOTT: Objection.

COURT: Overruled.

"Q. Was he, tell us whether or not he was walking toward this Shady Rest piccolo place?

MR. SCOTT: Objection.

COURT: Sustained.

"Q. Could you tell where he went? Could you see where he went?

MR. SCOTT: Objection.

COURT: Overruled.

A. Around the house.

. . . .

"Q. After you last saw him Kelvin, did you hear anything?

MR. SCOTT: Objection.

COURT: Overruled.

A. Yes sir.

"Q. What did you hear?

MR. SCOTT: Objection.

COURT: Overruled.

A. Shots.

"Q. How many shots did you hear?

MR. SCOTT: Objection.

COURT: Overruled.

A. Three.

"Q. Could you see anything at that time, could you see the place where the pool table is, the piccolo place, the Shady Rest, at that time from where you were?

MR. SCOTT: Objection.

COURT: Overruled.

A. No sir."

(1971); 1 Stansbury's North Carolina Evidence § 31 (Brandis rev. 1973) (hereinafter Stansbury). The trial judge's rulings on this aspect of the case were well within his discretion. This assignment of error is overruled.

[3]  Defendant next assigns as error a remark made by the trial court during defendant's cross-examination of the state's witness Andy Barnes. The witness was interrupted by Mr. Scott, defendant's counsel, who was cross-examining him; and the state lodged an objection to the interruption. The following then occurred:

> "COURT: Sustained. Now Mr. Scott, you've asked the witness a question and you've interrupted him. I'll have to let the witness when there's an objection answer the question. Let him finish answering the question.

> MR. SCOTT: Your Honor, he's throwing in something extra besides what I'm asking him.

> COURT: No sir."

Defendant contends these statements by the trial judge constituted an expression of opinion in violation of General Statute 1-180. He argues that the trial judge "unnecessarily belittled the defendant's counsel in his remarks" and that "when he responded in an emphatic negative manner to defendant's counsel's complaint . . . [t]his remark clearly implied to the jury that the State's witness' testimony was credible . . . . "

We find this contention without merit. Although it does not appear what question he had asked the witness, defendant's counsel clearly interrupted his answer. There is nothing to suggest the trial judge improperly sustained the district attorney's objection or that he was unnecessarily harsh in instructing defense counsel to let the witness finish his answer. Nor does the record show that the trial court's negative response to counsel's complaint was "emphatic." Even had it been, we fail to perceive how the jury could possibly have understood such a remark as an expression of opinion on the credibility of the witness. None of the cases cited by defendant contain any suggestion that such straightforward statements, relating solely to the manner of cross-examination by counsel, fall within the proscription of General Statute 1-180. This assignment of error is overruled.

[4]  Defendant next contends the trial judge committed error prejudicial to him in the following portion of his charge to the jury:

"If the State proves beyond a reasonable doubt that the defendant intentionally killed Alton Norman with a deadly weapon or intentionally inflicted a wound upon Alton Norman with a deadly weapon that proximately caused his death, you may infer that the killing was unlawful and second that it was done with malice, but you are not compelled to do so. You may consider this, along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice. A 22 caliber rifle is a deadly weapon."

Defendant argues that this instruction employs an unconstitutional presumption of malice and unlawfulness proscribed by *Mullaney v. Wilbur*, 421 U.S. 684 (1975). There is no merit in this contention.

In *State v. Hankerson*, 288 N.C. 632, 649-51, 220 S.E. 2d 575, 588 (1975), *rev'd on other grounds*, 432 U.S. 233 (1977), we said:

"The Mullaney ruling does not, however, preclude all use of our traditional presumptions of malice and unlawfulness. It precludes only utilizing them in such a way as to relieve the state of the burden of proof on these elements when the issue of their existence is raised by the evidence. The presumptions themselves, standing alone, are valid and, we believe, constitutional. *State v. Williams*, 288 N.C. 680, 220 S.E. 2d 558 (1975); *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712 (1974), pet. for cert. filed, 43 U.S.L.W. 3392 (U.S. Nov. 29, 1974) (No. 669). Neither, by reason of *Mullaney*, is it unconstitutional to make the presumptions mandatory in the absence of contrary evidence nor to permit the logical inferences arising from facts proved (killing by intentional use of deadly weapon), *State v. Williams, supra,* to remain and be weighed against contrary evidence if it is produced. The effect of making the presumptions mandatory in the absence of any contrary evidence is simply to impose upon the defendant a burden to go forward with or produce some evidence of all elements of self-defense or heat of passion on sudden provocation, or rely on such evidence as may be present in the State's case. The mandatory presumption is simply a way of stating our legal rule that in the absence of evidence of mitigating or justifying factors all killings accomplished through the intentional use of a deadly weapon are deemed to be malicious and unlawful.

. . . .

"If there is evidence tending to show all elements of heat of passion on sudden provocation or self-defense the mandatory presumption of malice and unlawfulness, respectively, disappear but the logical inferences remaining from the facts proved may be weighed against this evidence."

*Accord, State v. Hammonds,* 290 N.C. 1, 224 S.E. 2d 595 (1976). The instructions complained of comport with *Mullaney* as we understand it.

[5]  Defendant next assigns as error the trial court's instruction defining involuntary manslaughter: "Involuntary manslaughter is the *intentional* killing of a human being by an unlawful act not amounting to a felony or by an act done in a criminal, negligent way." (Emphasis supplied.) The instruction is, of course, erroneous. The word "intentional," if not an error in transcription, must have been used inadvertently. Earlier in his instructions the trial judge correctly defined involuntary manslaughter as "the unintentional killing of a human being by an unlawful act not amounting to a felony . . . . " Since defendant, however, was convicted of first degree murder, this *lapsus linguae* could not have been prejudicial. *State v. Freeman,* 275 N.C. 662, 170 S.E. 2d 461 (1969); *State v. Lipscomb,* 134 N.C. 689, 697, 47 S.E. 44, 46 (1904); *State v. Munn,* 134 N.C. 680, 47 S.E. 15 (1904); *see also State v. Potter,* 295 N.C. 126, 244 S.E. 2d 397 (1978); *compare State v. Brown,* 207 N.C. 156, 176 S.E. 260 (1934) (first degree murder conviction; error in instructions on second degree murder not cured by verdict).

[6, 7]  We have carefully considered defendant's remaining two assignments of error (1) that the trial judge failed on his own motion to declare a mistrial "for improper communication with the jury during the deliberations" and (2) that the defendant was denied due process because of "hostile sentiment in the audience of the courtroom against the defendant during . . . the trial." It is enough to say that these contentions are simply without foundation in the record. As to the first the trial court conducted a full inquiry. It disclosed only that the jury during its deliberations opened the jury room door and requested that it be allowed to review a certain exhibit that had been offered in evidence. The bailiff reported this request to the trial judge, who in turn properly instructed the jury on the point. In support of the second

contention defendant brings forward only three instances in the record where the trial judge admonished those present in the courtroom to be quiet.

The jury has resolved evidentiary conflicts against the defendant. In the trial there is

No error.