STATE OF NORTH CAROLINA v. DOUGLAS WILLIAMS, JR.

No. 277A82

(Filed 5 April 1983)

1. **Criminal Law §§ 75.2, 75.15— confession not result of intoxication or promises**

    The evidence on voir dire supported the trial court's determination that defendant's confession was voluntary and was not the result of intoxication or promises by the investigating officers that defendant would receive a shorter sentence in exchange for his admission of guilt.

2. **Criminal Law §§ 75.3, 76.10— attack on confession—theory not raised in trial court—confronting defendant with evidence**

    Where defendant failed to attack his confession at trial on the theory that it was coerced because he had been advised by the investigating officers that a comparison of his tennis shoes with shoe prints at the crime scene revealed similarities, he could not attempt to do so for the first time on appeal. Moreover, defendant's confession was not rendered involuntary and inadmissible as a result of his being so advised since the evidence with which defendant was confronted was competent; the fact that an investigating officer confronts a person in custody with evidence of his implication in a crime or evidence from the crime scene does not amount to "interrogation" within the meaning of *Miranda*; confronting a person in custody with such evidence is not the type of "subtle coercion" prohibited by *Miranda*; and defendant by sworn affidavit and testimony at trial stated that his confession was given only for other reasons.

3. **Homicide § 20.1— photographs of deceased's body—admissibility for illustrative purposes**

    Five photographic slides portraying the body of the deceased shortly after she was killed were properly admitted for the purpose of illustrating the testimony of a pathologist concerning the size, number and location of the various wounds and marks he observed on the body during an autopsy.

4. **Criminal Law § 112.1— instructions on reasonable doubt**

    When the trial court's instructions are read contextually and in their entirety, it is clear that the court's instruction that a reasonable doubt is a substantial misgiving "generated by the insufficiency of the proof" referred to insufficiency of the proof arising from the evidence as well as insufficiency of proof arising from the lack of evidence and was not improper.

State v. Williams

5. **Homicide § 21.6— murder committed in perpetration of first degree burglary—intent to commit larceny—sufficiency of evidence**

The State's evidence of defendant's intent to commit larceny at the time he broke into and entered a murder victim's home was sufficient to justify submission to the jury of the question of defendant's guilt of murder committed in the perpetration of first degree burglary, notwithstanding the State introduced defendant's confession in which he stated that he broke into and entered the home with the intent to find a place to sleep, where the State rebutted the exculpatory statement and showed an intent to commit larceny by other evidence tending to show that defendant armed himself with a stick prior to entering the victim's home, that he then proceeded to attack the victim by knocking her down with the stick and inflicting serious injuries upon her, and that defendant then went through the entire house and committed larceny therein by taking the victim's checkbook and keys and possibly other items.

6. **Homicide § 21.6— murder committed in perpetration of sex offense—sufficiency of evidence**

The trial court did not err in permitting the jury to consider the question of defendant's guilt of first degree murder in the perpetration of a sex offense where defendant admitted in his confession that, while the 100-year-old victim was lying helpless on the floor, he forced a mop handle into her vagina, and a forensic pathologist testified that this act was done with such force that the cavity of the vagina was torn with the tear extending through and into the rectum and continuing two and one-half inches into the sacrum bones, and that it was his opinion that this injury occurred while the victim was alive and, in combination with other injuries inflicted at the time, caused her death.

7. **Homicide § 21.5— first degree murder based upon premeditation and deliberation—sufficiency of evidence**

The trial court properly permitted the jury to consider the question of defendant's guilt of first degree murder based upon premeditation and deliberation where defendant stated during his confession that he first struck the victim when she threw a handful of salt at him after he broke into her home, and all the evidence tended to show that the killing was performed in a brutal manner, that the victim died as a result of numerous injuries inflicted to various parts of her body over a considerable period of time, and that several of the wounds inflicted upon the victim were the result of attacks after she had been felled and rendered helpless.

8. **Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating circumstance of first degree burglary—failure to instruct on intoxication**

In a sentencing hearing in which the court submitted the aggravating circumstance as to whether the murder was committed while defendant was engaged in the commission of first degree burglary, the trial court did not err in failing to instruct the jury concerning evidence of defendant's intoxication as affecting his ability to form the intent to commit larceny at the time he broke into and entered the victim's home where all of the evidence, except a statement in defendant's confession, indicated that he was not so intoxicated or impaired as to be unable to form a specific intent at the time in question. Even if the evidence had required the trial court to instruct on intoxication,

the failure to do so during the sentencing phase was not prejudicial error where the issue of intoxication was determined against defendant at the guilt-innocence determination phase of the trial when he had the benefit of full and correct instructions on the defense of intoxication.

**9. Criminal Law § 135.4— sentencing hearing—effect of jury's inability to agree—instruction not required**

The trial court did not err in failing to instruct the jury that a sentence of life imprisonment would be imposed upon the defendant in the event that the jury was unable to reach unanimous agreement on the proper sentence.

**10. Criminal Law § 135.4— first degree murder—premeditation and deliberation and felony murder theories—underlying felonies as aggravating circumstances**

Where defendant was convicted of first degree murder on both the theory of premeditation and deliberation and the theory of murder in the perpetration of felonies, the felonies upon which the conviction for murder in the perpetration of a felony was based could properly be considered as aggravating circumstances.

**11. Criminal Law § 135.4— first degree murder—sentencing hearing—mitigating circumstances—no significant history of prior criminal activity—form of issue**

While the form of the submission of the mitigating circumstance, "Does the defendant have a significant history of prior criminal activity?" is disapproved, the submission of such statutory mitigating circumstance in this form was not error under the circumstances of this case where the trial court specifically instructed the jury that a negative answer to the question would be an indication that they were satisfied that the mitigating factor existed, the court additionally specifically informed the jury that an affirmative answer would indicate only that the defendant had "failed to so satisfy you," and it is clear that the jury was not misled and did not consider its affirmative answer to the question as an affirmative finding of an aggravating circumstance.

**12. Criminal Law § 135.4— first degree murder—sentencing hearing—form of fourth issue**

The trial court's instructions on the fourth issue submitted to the jury in a sentencing hearing in a first degree murder case were sufficient where the court submitted an issue as to whether the jury unanimously found from the evidence and beyond a reasonable doubt that the aggravating circumstances found by it were sufficiently substantial to call for the death penalty, and the court instructed the jury that they must answer this fourth issue based upon their findings concerning both aggravating and mitigating circumstances.

**13. Criminal Law § 135.4— death penalty—pool of cases for proportionality review**

In determining whether a sentence of death imposed in a particular case is excessive or disproportionate to the penalty imposed in similar cases, the pool of "similar cases" used for comparison purposes will be all cases arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by the N.C. Supreme Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

**14. Criminal Law § 135.4— death penalty not disproportionate to penalty in similar cases**

Sentence of death imposed upon defendant was not disproportionate or excessive considering both the crime and the defendant where the evidence showed that defendant, after having struck the 100-year-old victim several times and felled her, continued to batter her with two heavy metal clock weights; after ransacking her home, defendant returned to the prostrate victim, pulled up her dress, and proceeded to force a mop handle into her vagina in such a fierce manner as to cause her to suffer massive internal injuries including multiple fractures of the sacrum and pubic bones; and defendant then took the victim's property and left her to die in a pool of her own blood.

Justice FRYE took no part in the consideration or decision of this case.

Justice EXUM dissenting as to sentence.

BEFORE *Fountain, Judge,* at the 16 November 1981 Criminal Session of Superior Court, EDGECOMBE County.

The defendant was charged in a bill of indictment, proper in form, with the murder of Adah Herndon Dawson. The jury found the defendant guilty of murder in the first degree and recommended that he be sentenced to death. Based upon the jury's recommendation, the trial court entered judgment sentencing the defendant to death. The defendant appealed to the Supreme Court as a matter of right.

*Rufus L. Edmisten, Attorney General, by Ralf F. Haskell, Assistant Attorney General, for the State.*

*H. Vinson Bridgers and Edward B. Simmons, for the defendant-appellant.*

MITCHELL, Justice.

The defendant brings forward assignments of error relating to the guilt-innocence determination phase and to the sentencing phase of his trial. Having carefully considered each of these assignments, as well as the entire record before us, we find no prejudicial error in either phase of the defendant's trial. Therefore, we do not disturb the defendant's conviction or the sentence of death.

I.

The evidence presented by the State during the guilt-innocence determination phase of the trial tended to show that

Adah Herndon Dawson was approximately one hundred years old in August, 1981. She lived in a house on her farm in Edgecombe County. She was visited by Rosella Spencer from approximately 3:30 to 4:00 p.m. on 1 August 1981 and appeared to be all right at that time. At approximately 8:00 p.m. on that date Adah Dawson talked by telephone with Lester Andrews for approximately fifteen minutes at which time she advised him that she was all right.

On the evening of 1 August 1981, Rosella Spencer went to a party at the home of her brother Clifton Edwards. Edwards' house was located in a field approximately one-half mile behind the Dawson home. A path leading to the Edwards home goes directly by the Dawson home. While attending the party in her brother's home, Rosella Spencer observed the Dawson home and noticed that the lights in the kitchen and breakfast room were on at approximately 10:30 p.m. At about the same time, Spencer observed the defendant at the party talking to her sister. She noticed what appeared to be a liquor bottle in the defendant's front pocket but did not see the defendant drinking or know whether he had been drinking. Spencer last noticed the defendant at her brother's home when he went outside sometime between 11:00 p.m. and midnight. Spencer left her brother's home between 1:30 and 2:00 a.m. and noticed that the light in the Dawson kitchen was off at that time while the light in the breakfast room was still on. At approximately 8:00 a.m. on Sunday morning 2 August 1981, Spencer's brother Clifton Edwards saw Adah Dawson's dogs running loose. He went to the Dawson home to put the dogs in their pen. He noticed that the screen porch door was unlatched and the wooden door to the Dawson home was open. He went inside and saw the body of the victim Adah Dawson lying on the floor in the kitchen. He then ran back to his home and called his sister Rosella Spencer. After receiving a call from her brother at approximately 8:05 a.m., Spencer went to the Dawson home. She went inside and saw the victim lying on her back on the kitchen floor. Spencer observed that the victim's dress was up to her waist and that there were no clothes on the lower half of her body. There were numerous wounds to the victim's face and head.

Members of the Edgecombe County Sheriff's Department arrived at the Dawson home at approximately 8:45 a.m. on 2 August 1981. They asked Rosella Spencer to reenter the Dawson home

with them because of her familiarity with the home. After entering the home, Spencer noticed that the weights to a cuckoo clock which hung in a front hall were missing. A drawer in the victim's bedroom was out of the dresser and her pocketbook, papers and other items were lying on the bed and floor. Other drawers were out in another room and screwdrivers and other items were strewn on the floor. A padlock used to keep the door to another room locked had been broken. A flashlight which the victim always kept on the nightstand in her bedroom was on a dresser in the room in which the screwdriver and other items were found on the floor. Spencer also observed that the drapes in the victim's bedroom, which were normally kept open, were closed over the window with a table pushed up to the window. Spencer had never known the victim to close the bedroom curtains in this manner. The curtains in the bathroom were also pulled together and were held shut by a cup placed in the window. Spencer had never known the victim to close these curtains in this manner.

Deputy Sheriff Jerry Wiggs of the Edgecombe County Sheriff's Department arrived at the Dawson home at approximately 8:45 a.m. on 2 August 1981. As he entered the home, Wiggs saw that the screen door to the porch had been torn away at the bottom. He saw the body of the victim on the floor. He also saw a large puddle of blood on the floor together with a puddle of melted ice cream which was between the victim's legs. The victim's head was against the refrigerator and her dress was pulled up to her waist with a mop lying over her vagina. He also saw a metal object in the shape of a pine cone on the floor near her leg and another near the upper part of her body. These objects were later identified as the weights from the clock in the hallway. Wiggs observed red and brown spots on the refrigerator, red spots on the wall and blood smeared on the floor. The blood was smeared across the floor from the door to the victim's body.

Chief Deputy Sheriff Tom Moore arrived at the Dawson home at approximately 9:45 a.m. When he entered the home, he saw the victim's body on the kitchen floor. His testimony tended to corroborate the testimony of Deputy Wiggs. Deputy Moore also observed blood on the screen door to the kitchen, a pair of glasses on the porch floor just outside the kitchen door, and the telephone off its cradle in the kitchen. He also observed that the handle to the mop located at the lower portion of the victim's

body extended between the victim's legs. Deputy Moore observed the general disarray of the house as described by the other witnesses.

Deputy Moore also observed that a person would be required to go through a fenced-in area outside the home in order to enter the porch from the outside of the home. While examining this fenced-in area, he noticed that a part of the fence was pushed down at the top. A chair was beneath the pushed down portion of the fence on the side closest to the home. On the other side of the fence from the chair, Deputy Moore found the victim's checkbook and key ring and some paper money and change.

Deputy Moore saw the defendant for the first time on 2 August 1981 while the defendant was sitting outside the Dawson home in Alcoholic Beverage Control Officer James Johnson's car. State Bureau of Investigation Agent Jim Wilson was also present at that time. The defendant was informed of his Miranda rights at that time and made a statement indicating that he had been to a party at one of the houses on the Dawson farm the night before where he had taken pills and consumed a pint of Vodka. The defendant stated he had gone home around 1:30 or 2:00 a.m., returned to the party later and finally returned home at approximately 3:00 a.m. He denied having been to the Dawson home on the night of 1 August 1981. After making this statement to the officers, the defendant went home.

A few hours later, Deputy Moore and Agent Wilson went to the defendant's home and asked for his tennis shoes. The defendant gave them the shoes and gave them permission to take the shoes to the Dawson home to compare them with the shoe prints found there. After making the comparison, Moore and Wilson returned to the defendant's home and told him that, based upon the results of the comparisons made, they wanted to take him to the Sheriff's Department in Tarboro for questioning. The defendant voluntarily went with them. When they arrived at the Sheriff's Department, the defendant was again given the Miranda warnings. He then agreed to talk with the officers and signed a written waiver of rights form. The officers told the defendant that a comparison had revealed that his tennis shoes made the shoe prints found at the Dawson home. The defendant thereafter made a statement to the officers. He first indicated that he had

gone to the Dawson home with someone else but later admitted that he had gone there alone. The defendant stated to the officers that he was "crazy drunk" from taking "speed" and drinking Vodka on that night. He stated that he had gone to the Dawson home looking for a place to sleep and had pulled open the screen door leading to the porch off the kitchen. He had not thought that anyone lived in the home and was surprised by the presence of the victim when he went inside. The defendant stated that the victim Adah Dawson threw a handful of salt at him as he was entering the house. He struck her several times with a stick he had picked up on the porch, and she fell toward him. He laid her on the floor and then went through the house looking for anything he could find. He washed some blood off of his clothing in one of the bathrooms. After going through the house, he went back into the kitchen and forced a mop handle into the victim's vagina. He stated that she then asked him to "please leave." He then threw the mop handle down and left. This statement by the defendant was reduced to writing by Agent Wilson and signed by the defendant. The officers questioned the defendant again and recorded the questions and answers. A typed transcript of the recording was made.

A forensic pathologist, Dr. Lewis Levy, performed an autopsy on the body of the victim Adah Dawson. During the course of the autopsy, he found numerous lacerations to the skin of the neck, face, scalp, ear, arms, vagina and rectum together with fractures of the face, skull, pubic bones and hip bone. Among numerous other injuries, he observed a laceration at the superior portion of the vagina which entered posterially into the rectum with a communicating tear in that area. Dr. Levy testified that in his opinion the fractures to the pubic bones were caused by a large amount of pressure applied to that area. He described the laceration to the victim's vagina as a tear inside her body continuing from her vagina to her rectum. The deepest part of her vagina cavity was torn with the tear extending through and into the rectum. Dr. Levy testified that these injuries were consistent with a stab or jab into the vagina cavity and that it would have taken considerable force to create these injuries. Dr. Levy testified that in his opinion the victim was alive at the time these injuries were inflicted upon her. He did not believe that any of the injuries alone caused her death, but that she died as a result

of the multiple injuries including the lacerations and fractures. Dr. Levy additionally testified that several of the lacerations and injuries to the victim were consistent with her being struck by a blunt force instrument such as a stick, while others were consistent with her being struck by the metal clock weights found near her body.

Several witnesses were accepted by the trial court as experts and testified for the State concerning fingerprint, shoe print and handwriting evidence. Special Agent Stephen Jones, Supervisor of the State Bureau of Investigation Crime Laboratory, testified that comparison tests made between footprint evidence taken from the Dawson home and the shoes the defendant gave the officers showed that some of the footprints were made by the defendant's shoes. This evidence further showed that some of the footprints were *probably* made by the defendant's shoes and some were *possibly* made by his shoes. Jones further testified that some of the tracks appeared to have been made at the time of the crime and that many of them were bloody. One of the tracks was found on the victim's underpants and another on a dishcloth in the kitchen. Fingerprint comparisons made by Special Agent Jones showed that several fingerprints found on various objects which apparently had been touched by the intruder in the Dawson home were made by the defendant.

Special Agent Dennis J. Mooney, an expert in handwriting analysis, testified that a comparison of the signature on a check found in the victim's checkbook outside the home with handwriting samples taken from the defendant by a court order showed that the signature in the checkbook was made by the defendant. David J. Spittle, a forensic serologist with the State Bureau of Investigation, testified concerning blood found throughout the house including the presence of tennis shoe prints in several rooms. Agent Spittle further testified that his investigation revealed human blood on the bottom of the defendant's tennis shoes and on one of the laces to the shoes.

The defendant offered no evidence during the guilt-innocence determination phase of the trial.

At the conclusion of the guilt-innocence determination phase of the trial, the jury returned a verdict finding the defendant guilty of murder in the first degree in the perpetration of first

degree burglary, in the perpetration of a sex offense, and with malice and premeditation and deliberation.

The trial court then convened a sentencing hearing to determine the sentence to be imposed. During the sentencing phase of the trial, the State introduced a written psychological report by Dr. Mary Rood, a forensic psychiatrist at Dorothea Dix Hospital. This report was prepared pursuant to a pre-trial psychiatric evaluation of the defendant ordered by the court. The report stated in pertinent part that the examining psychiatrist found no mental defect or disorder which would have prevented the defendant from distinguishing right from wrong at the time of the killing. The report further stated that, even though the defendant stated that he was intoxicated at the time of the killing and that intoxication may have impaired his judgment, it would not have relieved him of the responsibility for his actions. The State indicated that it would additionally rely upon the evidence presented at the guilt-innocence determination phase of the trial and offered no further evidence during the sentencing hearing.

The defendant offered into evidence at the sentencing hearing the "psychiatric testing" portion of Dr. Rood's report showing that the defendant scored in the range of mild mental retardation with an I.Q. of 63 and a reading ability of grade level 3.9. This portion of the report also indicated the possibility of significant organic brain impairment. The defendant also introduced evidence of his past criminal record including convictions for larceny, simple assault, assault on a female, damage to real property, using profane language, unauthorized use of a motor vehicle, trespass, and public drunkenness. No further evidence was presented at the sentencing hearing for the defendant.

Based upon the evidence introduced during the sentencing phase of the trial, the trial court presented four possible aggravating circumstances and five possible mitigating circumstances for the jury's consideration. The possible aggravating and mitigating circumstances and the jury's answers concerning the existence or lack of those aggravating and mitigating circumstances were as follows:

## ISSUES

1. Do you unanimously find from the evidence and beyond a reasonable doubt that one or more of the following

aggravating circumstances existed at the time of the commission of the murder?

(A) Was the murder committed while the defendant was engaged in the commission of first degree burglary?

Answer: Yes

(B) Was the murder committed while the defendant was engaged in a sexual act?

Answer: Yes

(C) Was the murder committed for pecuniary gain?

Answer: Yes

(D) Was the murder especially heinous, atrocious or cruel?

Answer: Yes

2. Do you unanimously find that one or more of the following mitigating circumstances existed at the time of the murder?

(A) Does the defendant have a significant history of prior criminal activity?

Answer: Yes

(B) Was the defendant under the influence of mental or emotional disturbance at the time of the murder?

Answer: No

(C) Was the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired?

Answer: No

(D) The age of the defendant at the time of the murder?

Answer: No

(E) Do you find any other circumstances arising from the evidence which the jury deems to have mitigating value?

Answer: No

3. Do you unanimously find from the evidence and beyond a reasonable doubt that the aggravating circumstances are sufficient to outweigh the mitigating circumstances?

Answer: Yes

4. Do you unanimously find from the evidence and beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial to call for the imposition of the death penalty?

Answer: Yes

Based upon their answers to these issues, the jury returned a sentence recommendation in which they recommended the death sentence. Following the recommendation by the jury of the penalty of death, the trial court entered judgment sentencing the defendant to death. The defendant appealed.

## II.

### GUILT-INNOCENCE DETERMINATION PHASE

The defendant has brought forward numerous assignments of error and supporting contentions concerning the guilt-innocence determination phase of his trial. We consider each of them in the order in which it is presented by the defendant.

[1] The defendant first contends that the trial court erred in admitting his confession into evidence. Over the defendant's objection, the trial court admitted into evidence the testimony of Deputy Moore regarding the confession made by the defendant at the Edgecombe County Sheriff's Office, the written summary of the defendant's confession prepared by S.B.I. Agent Wilson and the tape recording and transcript of the defendant's confession. The defendant contends that this constituted error by the trial court necessitating a new trial.

Prior to trial, the defendant filed a motion to suppress the extrajudicial confession made by him. In that motion the defendant specifically contended that his oral statements admitting guilt and any paper writings signed by him to that effect were solely the result of promises by the investigating officers to the defendant that he would receive a shorter sentence in exchange for his

admission of guilt. In an affidavit filed with that motion, the defendant swore that:

> [Y]our affiant was promised that if he would make a statement admitting his guilt that they, the above named officers, would see that he received a sentence of from Twenty years to Thirty years. That your affiant, in reliance of this promise, made a confession in which he admitted his guilt to the crimes under investigation.

The defendant did not seek a hearing on his motion prior to trial. At trial the defendant's counsel entered a general objection to testimony concerning the confession made by the defendant. The trial court excused the jury and conducted an extensive *voir dire* examination concerning the voluntariness of the defendant's confession. Evidence was presented by both the State and the defendant. In addition to the previously described affidavit, the defendant offered evidence through his own testimony. That testimony consumes several pages of the transcript, but is adequately summarized by the following:

> Q. Why did you make the statement?
>
> A. Because they promised me 20 to 30 years.
>
> Q. Is that the only reason you made the statement?
>
> A. Yes, sir.

The defendant also testified that he was drunk at the time he confessed. The State offered evidence contrary to the defendant's testimony and affidavit.

The trial court made extensive findings of fact and conclusions of law based upon the evidence introduced during the *voir dire* hearing. The trial court found that no threats or promises were made to induce the defendant's confession. Further, the trial court found that the defendant was fully informed of his rights and was fully aware of those rights when he knowingly, freely, voluntarily and intelligently waived his right to remain silent and to have counsel present. The court specifically found *inter alia*, "the defendant's testimony that he was threatened to be put away and that he was promised no more than 20 to 30 years if he talked and that he was drunk, to be unbelievable." Based upon its findings, the trial court concluded that the defendant fully

understood all of his rights and "knowingly, freely and voluntarily and intelligently waived those rights." The court then concluded that the confession was voluntary and admissible.

The defendant specifically concedes on appeal that, although there was conflicting evidence, the trial court's findings of fact were supported by substantial competent evidence. We agree. The findings were supported by competent evidence and themselves support the trial court's conclusions. These findings and conclusions, therefore, are binding upon this Court on appeal. *State v. Saults,* 299 N.C. 319, 261 S.E. 2d 839 (1980); *State v. Hill,* 294 N.C. 320, 240 S.E. 2d 794 (1978); *State v. White,* 291 N.C. 118, 229 S.E. 2d 152 (1976). Therefore, the trial court's ruling will not be disturbed on appeal, notwithstanding the fact that there was evidence from which a different conclusion could have been reached. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966), *cert. denied,* 386 U.S. 911 (1967).

[2]    Nevertheless, the defendant attempts on appeal to this Court to raise for the first time an additional challenge to the admissibility of his confession. He contends that his confession was inadmissible, due to the fact that prior to making the confession he was advised by the investigating officers that a comparison of his tennis shoes with shoe prints found at the scene of the crime revealed similarities. The defendant asserts that evidence of the shoe print comparison he was confronted with was not competent or admissible. He further contends that his confession induced by his being confronted with such evidence was a product of improper mental coercion employed in order to obtain his confession and that the resulting confession was inadmissible. Having failed to attack the admissibility of his confession on this ground during the trial, the defendant will not be allowed to attempt to do so for the first time on appeal to this Court. *State v. Hunter,* 305 N.C. 106, 286 S.E. 2d 535 (1982); *State v. Oxendine,* 305 N.C. 126, 286 S.E. 2d 546 (1982). We specifically reject the defendant's contention for this reason.

Even should we choose to reach and decide the issue raised by this contention, however, the defendant would not be entitled to relief. At trial, SBI Agent Jones was accepted as an expert witness and testified extensively concerning the unique characteristics of the tread on the shoes taken from the defendant

and the shoe prints found at the scene of the crime. He further testified concerning his comparison of the shoes with the shoe prints and the basis for his conclusion that some of the shoe prints at the scene were definitely made by the defendant's shoes. Such testimony was clearly competent. *State v. Long,* 293 N.C. 286, 237 S.E. 2d 728 (1977).

The fact that an investigating officer confronts a person in custody with evidence of his implication in a crime or evidence from the crime scene does not amount to "interrogation" within the meaning of *Miranda. State v. Temple,* 302 N.C. 1, 273 S.E. 2d 273 (1981); *State v. McLean,* 294 N.C. 623, 242 S.E. 2d 814 (1978). Further, confronting a person in custody with such evidence is not the type of "subtle coercion" prohibited by *Miranda. Id.* Additionally, the defendant by sworn affidavit and testimony at trial stated that his confession was given *only* for other reasons than the reason he asserts here. The defendant's in-custody statement, therefore, was not rendered involuntary and inadmissible as a result of his being informed that a comparison of his shoes with shoe prints at the scene of the crime revealed similarities.

[3] The defendant next contends that the trial court erred by admitting into evidence for illustrative purposes five photographic slides portraying the body of the deceased shortly after she was killed. The defendant argues that these slides could have been properly introduced during the sentencing phase of the trial as evidence of the aggravating factor of an especially heinous, atrocious or cruel offense, but that their introduction during the guilt-innocence determination phase of the trial was error. The defendant argues that the inflammatory and prejudicial effect of these slides outweighed any probative value they may have had.

Photographs are admissible into evidence to illustrate the testimony of a witness, and their admission with limiting instructions for that purpose is proper. *State v. Horton,* 299 N.C. 690, 263 S.E. 2d 745 (1980). The fact that, as here, photographs depict a gruesome and revolting scene indicating a vicious crime does not render them incompetent in evidence when they are properly authenticated as accurate portrayals of conditions observed and related by the witness who uses them to illustrate his testimony. *State v. Gibbons,* 303 N.C. 484, 279 S.E. 2d 574 (1981).

The five slides in question were introduced during the State's examination of Dr. Lewis Levy, a forensic pathologist, who performed the autopsy on the victim and testified concerning her injuries and the cause of her death. The slides, having been properly authenticated, were used by Dr. Levy to illustrate his testimony concerning the size, number and location of the various wounds and marks he observed on the victim during the autopsy. Our viewing of these slides indicates that no slide was repetitious of another and each related to specific wounds which Dr. Levy described and testified that he had observed. Each slide had distinct probative value and was admissible for purposes of illustrating Dr. Levy's testimony. If the things portrayed in the slides were in fact gory and gruesome, this resulted solely from the nature of the crime committed and its consequences and not from any excessive use of slides to illustrate the testimony of the pathologist. The admission of these slides by the trial court for the limited purpose of illustrating the testimony of the witness was not error.

[4]  The defendant next contends that the trial court erred in its instructions to the jury by incorrectly defining the term "reasonable doubt." The defendant argues that, by instructing the jury that a reasonable doubt can only be "generated by the insufficiency of the proof," the trial court precluded the jury from finding a reasonable doubt based upon the evidence. The defendant points out that this Court has held it to be error for a trial court to instruct the jury that a reasonable doubt may be based upon the evidence presented but fail to inform the jury that a reasonable doubt may also arise from the lack of evidence. *State v. Hammonds*, 241 N.C. 226, 85 S.E. 2d 133 (1954). The defendant, relying upon the converse to the holding in *Hammonds* and citing *State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976), argues that it is also error for the trial court to instruct the jury that a reasonable doubt may be based upon the insufficiency of proof but fail to instruct that a reasonable doubt may also arise out of the evidence. The defendant contends, therefore, that the failure of the trial court in the present case to instruct the jury that a reasonable doubt may arise from the evidence was error requiring a new trial.

The trial court in the present case instructed the jury as follows, in pertinent part:

The burden of proof is upon the state to satisfy the jury *from the evidence* in the case and beyond a reasonable doubt of his guilt.

Now, a reasonable doubt is not a vain, imaginary or fanciful doubt but it is a sane, rational doubt. When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or satisfied to a moral certainty of the truth of the charge. If after *considering,* comparing and weighing *all of the evidence* the minds of the jurors are left in such condition that they cannot say they have an abiding faith to a moral certainty in the defendant's guilt, then they have a reasonable doubt. Otherwise, they do not.

A reasonable doubt as that term is employed in the administration of criminal law is an honest, substantial misgiving, generated by the insufficiency of the proof; an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused.

It is not a doubt suggested by the ingenuity of counsel or by your own ingenuity not legitimately warranted by the testimony. Nor is it one born of a merciful inclination or disposition to permit the defendant to escape the penalty of the law, nor one prompted by sympathy for him or those connected with him.

(Emphasis added.) The portions of the trial court's instructions complained of by the defendant in the present case are almost identical to the instructions suggested in *State v. Schoolfield,* 184 N.C. 721, 114 S.E. 466 (1922) and *State v. Steele,* 190 N.C. 506, 130 S.E. 308 (1925), which were later cited with approval in *State v. Hammonds,* 241 N.C. 226, 85 S.E. 2d 133 (1954), relied upon by the defendant here. We find the trial court's instructions on reasonable doubt in the present case free from reversible error.

A trial court's instructions to the jury must be construed contextually and in their entirety. When the portion of the trial court's instructions of which the defendant complains is considered in this manner, it is apparent that the instructions carry

the very meaning that the defendant contends were omitted. In the sentence immediately preceding the trial court's efforts to define the term "reasonable doubt," the trial court instructed the jury that "the burden of proof is upon the State to satisfy the jury *from the evidence* in the case and beyond a reasonable doubt of his guilt." (Emphasis added.) Additionally, the court referred to the jury's responsibility to consider matters arising *from the evidence* at several other points in the instructions when speaking to the State's burden of proof and reasonable doubt. When the instructions are read contextually and in their entirety, it is apparent that, when the trial court used the phrase "insufficiency of the proof" in its instructions on reasonable doubt, it was referring to insufficiency of proof arising from the evidence as well as insufficiency of proof arising from the lack of evidence. *See State v. Swift,* 290 N.C. 383, 226 S.E. 2d 652 (1976). The instructions of the trial court in this regard were without error.

The defendant next contends that the trial court erred in permitting the jury to consider returning verdicts of guilty of first degree murder in the perpetration of a felony upon either the theory that he murdered the victim in the perpetration of first degree burglary or the theory that he murdered the victim in the perpetration of a sex offense. We will discuss the evidence and applicable law with regard to each of these theories separately.

Before the question of a defendant's guilt of a particular crime may be submitted to the jury for its consideration, the trial court must find substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator of the offense. *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial evidence must be existing and real, but need not exclude every reasonable hypothesis of innocence. *State v. Smith,* 40 N.C. App. 72, 252 S.E. 2d 535 (1979). In determining whether such substantial evidence has been introduced, "[t]he evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal . . . ." *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980).

[5]  The defendant argues that the evidence was insufficient to permit the issue of murder committed in the perpetration of first degree burglary to be submitted to the jury. The elements of burglary in the first degree are the (1) breaking and (2) entering, (3) in the nighttime, (4) of a dwelling house, (5) of another, (6) which is actually occupied, (7) with the intent to commit a felony therein. *State v. Simpson,* 303 N.C. 439, 279 S.E. 2d 542 (1981). For purposes of defining the crime of burglary, the intent to commit larceny is deemed the intent to commit a felony without regard to the value of the property in question. *See* G.S. 14-51. In order to justify submission to the jury of the issue of a defendant's guilt of burglary in the first degree, there must be substantial evidence tending to show that the intent charged in the bill of indictment was in the mind of the intruder at the time he forced entrance into the house. *See State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269 (1967). The defendant contends that the evidence bearing on his intent at the time he broke into and entered the Dawson home was insufficient to justify the submission of the question of his guilt of murder in the perpetration of burglary in the first degree to the jury.

When the evidence is considered in the light most favorable to the State, as it must be, we find that there was substantial competent evidence sufficient to justify the submission to the jury of the question of the defendant's guilt of murder in the perpetration of burglary in the first degree. Here, the defendant admitted breaking and entering into the victim's home while it was actually occupied and in the nighttime. Ordinarily, evidence of an unexplained breaking and entering into a dwelling house in the nighttime constitutes substantial evidence in itself that the breaking and entering was done with the intent to commit larceny. *State v. Hedrick,* 289 N.C. 232, 221 S.E. 2d 350 (1976). The defendant argues, however, that in the present case evidence of the breaking and entering into the dwelling house in the nighttime was explained by him in his confession and that the principle of law arising upon evidence of an unexplained breaking and entering into a dwelling at night is, therefore, inapplicable. The defendant further argues that, since the State introduced and relied upon his confession in which he stated that he broke into and entered the Dawson home only with the intent to find a place to sleep, the State is bound by this explanation.

State v. Williams

When the State introduces into evidence a defendant's confession containing exculpatory statements which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by the exculpatory statements. *State v. Johnson*, 261 N.C. 727, 136 S.E. 2d 84 (1964). The introduction by the State of a confession of the defendant which includes such exculpatory statements, however, does not prevent the State from showing facts which contradict the exculpatory statements. The State is not bound by the exculpatory portions of a confession which it introduces if it introduces other evidence tending to contradict or rebut the exculpatory statements of the defendant contained in the confession. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982); *State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, 434 U.S. 928 (1977).

In the present case, the State offered substantial evidence tending to rebut the exculpatory portions of the defendant's confession in which he indicated that he broke into and entered the Dawson home solely for the purpose of finding a place to sleep. The State offered evidence, in the form of the defendant's confession and otherwise, tending to show that the defendant armed himself with a stick prior to entering the Dawson home. He then proceeded to attack the victim by knocking her down with the stick and inflicting serious injuries upon her. The defendant then went through the entire house and committed larceny therein by taking the victim's checkbook and keys and, possibly, some paper money and change. The evidence that the defendant armed himself before entering the home tends to contradict his version that he entered only for the purpose of finding a place to sleep. Therefore, the State was not bound by this exculpatory statement in his confession. Additionally, the fact that the defendant actually committed larceny after entering the home, although not conclusive, is substantial evidence which would support a finding that the defendant had formed the intent to commit larceny at the time he broke into and entered the home. *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269 (1967). Therefore, the State was not required to rely upon any inference of law arising from an unexplained breaking and entering of a dwelling at night. Instead, the State offered substantial evidence, albeit circumstantial evidence, that the defendant had formed the intent to commit larceny at

the time he broke into and entered the Dawson home. The trial court did not err in permitting the jury to consider the question of the defendant's guilt of murder committed in the perpetration of the felony of burglary in the first degree.

[6] The defendant further contends that the trial court erred in permitting the jury to consider the question of his guilt of first degree murder in the perpetration of a sex offense. In support of this contention, the defendant points out that the forensic pathologist who performed the autopsy upon the victim testified that he did not believe that any one of her injuries alone would have necessarily caused her death. Based upon this evidence he asserts that there was no substantial evidence that the forcing of a mop handle into the victim's vagina caused her death and, therefore, no substantial evidence that he murdered the victim while in the perpetration of this sex offense. We find this contention and these arguments without merit.

While an interrelationship between the felony and homicide must exist in order for the rules concerning murder in the perpetration of a felony to be applicable, there is no requirement that the felony must be the proximate cause of the victim's death. *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976). It is immaterial whether the felony occurred prior to or immediately after the killing so long as it is a part of a series of incidents which form one continuous transaction. *State v. Wooten,* 295 N.C. 378, 245 S.E. 2d 699 (1978). During the defendant's confession, he stated that, while the one hundred year old victim was lying helpless on the floor, he forced a mop handle into her vagina. The forensic pathologist testified that this act was done with such force that the cavity of the vagina was torn with the tear extending through and into the rectum and continuing two and one-half inches into the sacrum bones. The pathologist further testified that it was his opinion that this injury occurred while the victim was alive and, in combination with other injuries inflicted at the time, caused her death. Such evidence was substantial evidence that the defendant murdered the victim in the perpetration of a sex offense and the trial court did not err in submitting the issue to the jury.

[7] The defendant also contends that the trial court improperly permitted the jury to consider the question of his guilt of murder

in the first degree based upon premeditation and deliberation. In support of this contention, the defendant again argues that the State was bound by the exculpatory statements in his confession and that the evidence, therefore, conclusively established that the killing was not done with premeditation and deliberation. We find that portions of the defendant's confession and other evidence introduced by the State tend to conflict with and rebut the exculpatory portions of the confession and tend to establish premeditation and deliberation. Therefore, the exculpatory portions of the confession in which the defendant indicated that he was drunk, did not know the house was occupied, and entered only to find a place to sleep were not binding upon the State or the trial court. *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038 (1982).

If there was substantial evidence of each essential element of murder in the first degree based upon premeditation and deliberation, the trial court properly permitted the jury to consider the question of the defendant's guilt of murder in the first degree on that theory. *See State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). Murder in the first degree is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17; *State v. Fleming,* 296 N.C. 559, 251 S.E. 2d 430 (1979). Premeditation means thought out beforehand for some length of time, however short, but no particular time is required for the mental process of premeditation. *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974). Deliberation means an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Bush,* 307 N.C. 152, 297 S.E. 2d 563 (1982); *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769, *cert. denied,* 368 U.S. 851 (1961). The term "cool state of blood" does not mean that the defendant must be calm or tranquil or display the absence of emotion; rather, the defendant's anger or emotion must not have been such as to overcome the defendant's faculties and reason. *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974). Premeditation and deliberation refer to processes of the mind. They are not ordinarily subject to proof by direct evidence, but must generally be proved, if

at all, by circumstantial evidence. *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975). Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Potter,* 295 N.C. 126, 244 S.E. 2d 397 (1978); *State v. Fountain,* 282 N.C. 58, 191 S.E. 2d 674 (1972); *State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484 (1969).

In the present case, all of the evidence introduced tended to indicate that the killing was performed in a brutal manner. The victim died as a result of numerous injuries inflicted to various parts of her body over a considerable period of time. Both the defendant's confession and the physical evidence tend to show that several of the wounds inflicted upon the victim were the result of attacks after she had been felled and rendered helpless. The defendant stated during his confession that he first struck the victim when she threw a handful of salt at him after he broke into her home. We do not believe that the throwing of salt at an intruder by a one hundred year old woman constituted provocation on the part of the deceased. Instead, all of the evidence tends to indicate an unprovoked and murderous assault carried out over a protracted period of time upon a woman of great age in her own home and with an utter lack of provocation on her part. The evidence was clearly sufficient to support the submission of the issue of the defendant's guilt of premeditated and deliberate murder to the jury and to support the jury's verdict of guilty. The trial court did not err in submitting this issue to the jury.

### III.

### SENTENCING PHASE

The defendant also has brought forward several assignments of error and supporting contentions relating to the sentencing phase of his trial. We now consider each of his contentions in this regard.

[8] The defendant contends that the trial court erred in failing to instruct the jury during the sentencing phase of the trial concerning evidence of the defendant's intoxication as affecting his ability to form the intent to commit a felony which is an essential element of burglary in the first degree. Following the presentation of evidence at the sentencing hearing, the trial court instructed the jury concerning the aggravating circumstances which could be considered by the jury in reaching its sentencing recommendation, including the aggravating circumstance that "the murder was committed while the defendant was engaged in the commission of first degree burglary." During this portion of the trial court's instructions, it did not instruct the jury concerning evidence of the defendant's intoxication as affecting his ability to form the intent to commit larceny. The defendant argues that, had the trial court done so, the jury might have found that his intoxication precluded him from forming the necessary intent and found this aggravating circumstance not to exist.

When instructing the jury during the guilt-innocence determination phase of the trial concerning the specific intent element of burglary in the first degree, the trial court gave the instruction on intoxication that the defendant contends also should have been given in the instructions during the sentencing phase of the trial. When instructing the jury during the sentencing phase of the trial concerning the aggravating circumstance of burglary in the first degree, the trial court referred to its previous instructions given during the guilt-innocence determination phase and stated that "unless requested to do so, I will not go into as much detail as I did at the first phase of the trial when I charged you this morning on the question of guilt or innocence." The trial court then correctly instructed the jury on the elements of burglary in the first degree including the intent to commit larceny. The trial court did not again instruct the jury concerning intoxication, however, as it had in its instructions on burglary in the first degree during the guilt-innocence determination phase of the trial. The defendant did not object to this failure or make a request for any such instruction, despite the trial court's indication that it would give a more detailed instruction on burglary in the first degree if the parties desired. We find no error by the trial court in this regard.

Although voluntary intoxication is not a legal excuse for a crime, where a specific intent is an essential element of the crime charged, the fact of intoxication may negate the evidence of that specific intent if it is shown that the defendant was so intoxicated at the time he committed the crime that he was utterly unable to form the necessary specific intent. *State v. Gerald*, 304 N.C. 511, 284 S.E. 2d 312 (1981); *State v. Fowler*, 285 N.C. 90, 203 S.E. 2d 803 (1974), *death sentence vacated*, 428 U.S. 904 (1976). The trial court is not required, however, to instruct the jury concerning the defense of intoxication when the evidence does not tend to show that the defendant was so completely intoxicated as to be utterly unable to form the specific intent necessary at the time the crime was committed. *Id.; State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979); *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238 (1975), *death sentence vacated*, 428 U.S. 903 (1976).

In the present case there was no evidence in the record tending to show that the defendant was intoxicated at all other than his own statements contained in his confession. Rosella Spencer testified that she saw the defendant at a party in her brother's home shortly before the victim was killed. She observed what appeared to be a bottle of liquor in his front pocket but testified that he did not drink any liquor in her presence that evening. Although the defendant stated in his confession that he had been drinking and taking "speed" and was "crazy drunk" at the time he killed the deceased, he did not state that he was so intoxicated that he did not know what had occurred when he killed the deceased or that he had been unable to control his thoughts or actions at that time. With the exception of the statement that he was "crazy drunk," the defendant's confession tended to show that he was entirely able to form a specific intent to commit larceny at the time he broke into and entered the Dawson home. The defendant gave a complete and detailed description of the events which he contended occurred at the time of the killing. He described in great detail the manner in which he broke into the home as well as apparently recalling every word of the conversation he had with the deceased when he found her in the home. He was able to describe the property he stole and where he found it in the home. He was also able to describe in detail the various wounds he inflicted upon the deceased and the manner in which he then went to the bathroom sink and washed his hands and got

the blood off his pants before leaving the scene. He was even able to recall that there was dew on the grass as he entered the Dawson home.

Perhaps more importantly, the defendant's own "exculpatory" statements in his confession contain direct testimony by him that he was able to form and in fact had formed a specific intent at the time he entered the home. In this regard, the defendant clearly and directly stated that he had formed the specific intent to find a place to sleep at the time he entered the Dawson home. Thus, the only statement from the defendant directly relating to his ability to form a specific intent at the time of the crime indicated that he was able to form such an intent. This entirely negated any probative value on the issue that his statement that he was "crazy drunk" otherwise might have had.

All of the evidence except the defendant's one brief statement clearly indicated that he was not so intoxicated or impaired as to be unable to form a specific intent at the time in question. We hold, therefore, that there was not sufficient evidence of intoxication in the present case to require any instruction at all as to the law concerning the defense of intoxication. *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974), *death sentence vacated,* 428 U.S. 904 (1976); *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671 (1971), *death sentence vacated,* 408 U.S. 939 (1972); *State v. Bunton,* 247 N.C. 510, 101 S.E. 2d 454 (1958). The failure of the trial court to instruct the jury with regard to the defense of intoxication during the sentencing phase of the trial was not error.

The trial court in the present case should not have instructed the jury with regard to the defense of intoxication during the guilt-innocence determination phase of the trial, as the evidence introduced entirely failed to tend to show that at the time of the commission of the crime in question the defendant's mind and reason were so overcome by intoxication that he could not form the specific intent to commit a felony which is a necessary element of burglary in the first degree. The trial court's error of instructing the jury with regard to the defense of intoxication in the guilt-innocence determination phase, when that defense did not arise from the evidence, however, was error clearly favorable to the defendant which could not have prejudiced him.

Further, even had the evidence required the trial court to instruct the jury on the defense of intoxication, the failure to do so during the sentencing phase of the trial in the present case would not be prejudicial error. In instructing the jury with regard to the elements of burglary in the first degree during the guilt-innocence determination phase of the trial, the trial court fully instructed as to the defense of intoxication as it related to the essential element of the defendant's specific intent to commit larceny. The jury then found the defendant guilty of murder in the commission of burglary in the first degree and necessarily found, even in light of the defendant's contention that he was intoxicated, that the defendant entered the victim's home with the required specific intent to commit larceny. The issue was, therefore, determined against the defendant during the guilt-innocence determination phase of the trial when he had the benefit of full and correct instructions on the defense of intoxication. No additional evidence concerning intoxication was presented to the jury during the sentencing phase of the trial. It would be unreasonable to believe that the jury would have come to a different conclusion during the sentencing phase, based upon the same evidence it had previously considered and rejected, even had the trial court again given instructions on the defense of intoxication. Clearly no prejudice to the defendant could have resulted from the trial court's failure to instruct the jury concerning the defense of intoxication during the sentencing phase of the defendant's trial.

[9] The defendant next contends that the trial court erred by failing to instruct the jury that a sentence of life imprisonment would be imposed upon the defendant in the event that the jury was unable to reach unanimous agreement on the proper sentence. We have frequently held and hold in this case that such an instruction is improper because it would be of no assistance to the jury and would invite the jury to escape its responsibility to recommend the sentence to be imposed by the expedient of failing to reach a unanimous verdict. *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569 (1982); *State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264 (1982); *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981). The trial court did not err in failing to give this instruction.

[10] The defendant next contends that the trial court erred during the sentencing phase of the trial in permitting the jury to con-

sider as aggravating circumstances the underlying felonies upon which his convictions for murder in the perpetration of felonies were based. Specifically, the defendant contends that the trial court erred in submitting as aggravating factors for the jury's consideration that the murder was committed in the perpetration of first degree burglary and in the perpetration of a sex offense.

We have previously held, in cases in which the defendant is convicted of murder in the perpetration of a felony, that it is error for the jury to be allowed to consider as aggravating circumstances the underlying felonies upon which the murder conviction is based. *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941 (1980). Here, however, the defendant was convicted of murder in the first degree on both the theory of premeditation and deliberation and the theory of murder in the perpetration of felonies. In such cases, we have held that a felony upon which the conviction for murder in the perpetration of a felony is based may also be considered as an aggravating circumstance. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). In such cases, the commission of the felony underlying the conviction for murder in the perpetration of a felony is not an essential element of the crime of premeditated and deliberate murder and may properly be submitted to the jury as an aggravating circumstance. *Id.* The trial court did not err in the present case by allowing the jury to consider as aggravating circumstances the felonies underlying the convictions for murder in the perpetration of felonies.

The defendant next contends that the trial court erred in refusing to grant the defendant's motion for a new trial and for appropriate relief for errors committed during the trial. The defendant advances no additional arguments in support of this contention and relies upon his prior assignments, contentions and arguments. For the reasons previously discussed herein, we find this contention to be without merit.

IV.

Although the defendant has presented no additional assignments of error or contentions, we also undertake to discuss two issues not raised at trial or on appeal.

## A.

[11] One of the statutory mitigating circumstances which may be considered during the sentencing phase of a capital case is that: "The defendant has no significant history of prior criminal activity." G.S. 15A-2000(f)(1). During the sentencing phase of the trial, the defendant sought to establish this mitigating circumstance by introducing evidence of his past criminal record to show that he had no *significant* history of prior criminal activity. In this context, he introduced evidence of his past convictions for larceny, simple assault, assault on a female, damage to real property, using profane language, unauthorized use of a motor vehicle, trespass, and public drunkenness. At the conclusion of the evidence in the sentencing phase of the trial, the trial court submitted five mitigating circumstances and required the jury to determine whether each or any of them existed. The first mitigating circumstance the trial court submitted was: "(A) Does the defendant have a significant history of prior criminal activity?" In its written answer to this question, the jury answered, "Yes." The submission of the question of the existence of the statutory mitigating circumstance in this form and the resulting answer did not convert the negative finding as to the mitigating circumstance into an affirmative finding of an aggravating circumstance. Therefore, the submission of the issue to the jury in this form was not error. Nevertheless, we do not approve of submitting the question of the existence of this mitigating circumstance to the jury in the form used here. Under circumstances other than those presented in the present case, the form in which the issue was submitted might well constitute error.

In the present case, the trial court fully and correctly instructed the jury with regard to the manner in which they were to determine the existence of the aggravating circumstances if any. The trial court then instructed the jury concerning mitigating circumstances as follows:

> After considering issue number one and the subsections (A), (B), (C) and (D), you will consider issue number two which reads: "Do you unanimously find that one or more of the following mitigating circumstances existed at the time of the murder?
>
> Now, members of the jury, the burden as to that issue and the subsections is upon the defendant, but he does not

have the burden of satisfying you beyond a reasonable doubt as to the existence of any mitigating circumstance. He has the duty merely to satisfy you from the evidence in the case, and "(A)" under that section reads: "Does the defendant have a significant history of prior criminal activity?" Of course, if he does not that is a mitigating circumstance.

The defendant contends that his criminal record has been offered and that it consists of simple offenses, offenses of little consequence. He contends that even though there has been offered in evidence certified copies of a record of seven — eight — nine convictions that many of them were he contends when he was much younger. That they were principally simple assaults. That in most instances he was released from jail when he was convicted because he had been in jail a week or two, and that in many of them he was fined only a small fine or court costs or given probation; and that only once has he served an active prison sentence. So, he contends, members of the jury, that there is nothing significant about that.

The word, "significant," as used in this issue means important, momentous; and the question is whether the defendant has a significant history of criminal activity or whether he does not.

If he has satisfied you, merely satisfied you, that he does not have a significant history of prior criminal activity, then you will answer that, "No", that is to say that he does not. If he has failed to so satisfy you and if you believe that the record which has been offered as to his prior criminal record is a significant history of prior criminal activity, you would answer it, "Yes."

Although the defendant took an exception to this portion of the trial court's instructions, he did not bring this exception forward on appeal or incorporate it under any of his assignments of error. Even in capital cases, a defendant may waive his right to contend that the trial court erred in a particular manner by failing to take exceptions or by failing to bring his exceptions forward and make them part of an assignment of error and argue them on appeal. *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* --- U.S. ---, 74 L.Ed. 2d 622 (1982); *State v. Hutchins,* 303 N.C. 321, 279

S.E. 2d 788 (1981); *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979). Here the defendant failed to object to the form of the proposed issues concerning mitigating circumstances as submitted to the jury in writing by the trial court and failed to bring forward his exception to the trial court's instructions on this mitigating circumstance or present an assignment of error or argument based on that exception. Therefore, any error with regard to the manner in which this mitigating circumstance was submitted to and answered by the jury is deemed waived.

However, we undertake to review this point in the exercise of our supervisory powers. Upon reviewing the form in which the mitigating circumstance was submitted to the jury and the trial court's explanatory instructions relative thereto, it is apparent that the jury was not misled and did not consider its failure to find the mitigating circumstance of "no significant history of prior criminal activity" an affirmative finding of an aggravating circumstance. The trial court specifically instructed the jury that a negative answer to the question as put to them in writing would be an indication that they were satisfied that the mitigating factor existed. The trial court additionally specifically informed the jury that an affirmative answer would indicate only that the defendant had "failed to so satisfy you . . . ." The trial court in no way hinted, nor could the jury reasonably have concluded, that the absence of the mitigating circumstance of "no significant history of prior criminal activity" should be or could be considered as an aggravating factor. Therefore, *given the specific instructions to the jury in this case,* the affirmative answer indicating that the defendant had a significant history of prior criminal activity was no more damaging than a negative finding with regard to any other mitigating circumstance the jury was required to consider.

We again caution, however, that the form used by the trial court in submitting this mitigating factor to the jury here is not approved. Trial courts will do well to follow strictly the terminology used in the statute in formulating issues concerning aggravating and mitigating circumstances to be considered by the jury in capital cases. *E.g.* G.S. 15A-2000(e) and (f). We additionally point out that today we have given specific guidance to the Trial Bench concerning the order in which juries should be required to consider the issues arising during the sentencing phase of capital

State v. Williams

cases and the instructions juries should be given during that phase. *State v. Michael Van McDougall* (case No. 86A81, filed this date).

B.

[12]  In *McDougall* we have set forth the principles controlling the manner and form in which the pertinent issues are to be put to the jury during the sentencing phase of a capital case. In *McDougall* we also suggested the following as the proper form of the fourth issue:

> Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?

We have additionally set forth in detail in *McDougall* recommended instructions relative to the fourth issue and have held that the trial court must instruct the jury substantially in accord with those recommended instructions.

In the present case, the fourth issue put to the jury during the sentencing phase of the trial was, "Do you unanimously find from the evidence and beyond a reasonable doubt that the aggravating circumstances found by you are sufficiently substantial to call for the imposition of the death penalty?" The form of the question itself did not inform the jury that they should resolve this issue in light of the totality of both the aggravating and mitigating circumstances as required by *McDougall.* In his instructions to the jury, however, Judge Fountain informed the jury that they must answer this fourth question based upon their findings concerning both aggravating and mitigating circumstances. Therefore, we hold that Judge Fountain's instructions to the jury in this regard substantially complied with the requirements and recommendations set forth by us today in *McDougall* and were free of prejudicial error. Judge Fountain did not, of course, have the guidance we have given today in *McDougall* available to him at the time this case was tried. We suggest, however, that the Trial Bench give its immediate attention to the requirements and recommendations set forth in that case.

V.

As a final matter in every capital case, we must turn to the performance of our independent statutory duties. We are directed by G.S. 15A-2000(d)(2) to review the record in a capital case to determine (1) whether the record supports the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. After a thorough review of the transcript, record on appeal and briefs of the defendant and the State in the present case, we find that the record for reasons previously pointed out herein completely supports the jury's written findings of four aggravating circumstances. We further find that the death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the transcript and record are devoid of any indication that such impermissible influences were a factor in the sentence.

[13] We next reach our final statutory duty of proportionality review, *i.e.* the duty of determining whether the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. This Court has not previously announced the manner in which our proportionality review is conducted. Specifically, we have not indicated the types of cases we view as being "similar cases" to be used for the comparisons required during our statutorily mandated proportionality review. We do so now.

In comparing "similar cases" for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time. We are aware that the Supreme Court of the United States has declined to invalidate a proportionality review process which failed to con-

sider cases other than those which were appealed and in which the death sentence was imposed. *Proffitt v. Florida*, 428 U.S. 242, 259, n. 16 (1976). We are also aware that the Supreme Court has upheld capital punishment procedures which did not include the same standard for appellate review of death sentences which we apply today. *Jurek v. Texas*, 428 U.S. 262 (1976). Nevertheless, we believe that the use of the pool of "similar cases" which we announce today for purposes of our proportionality review provides a meaningful basis for distinguishing in a principled way the few cases in which the death penalty is imposed from the many cases in which it is not imposed. *See Godfrey v. Georgia*, 446 U.S. 420 (1980); *Gregg v. Georgia*, 428 U.S. 153 (1976).

Having described the pool of "similar cases" we use for proportionality review in capital cases, we will also describe briefly the methods we will employ in making our comparisons. We do not propose to attempt to employ mathematical or statistical models involving multiple regression analysis or other scientific techniques, currently in vogue among social scientists, which have been described as having "the seductive appeal of science and mathematics." *Blake v. Zant*, 513 F. Supp. 772, 827 App. (S.D. Ga. 1981). The factors to be considered and their relevancy during proportionality review in a given capital case are not readily subject to complete enumeration and definition. Those factors will be as numerous and as varied as the cases coming before us on appeal. This truth is readily revealed by a comparison of the opinions of the Justices of the Supreme Court of the United States concerning the relevancy of certain factors as revealed in *Godfrey v. Georgia*, 446 U.S. 420 (1980). Even those with extensive training in data collection and statistical evaluation and analysis are unable to agree concerning the type of statistical methodology which should be employed if statistical or mathematical models are adopted for purposes of proportionality review. *E.g.* Baldus, Pulaski, Woodworth and Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach*, 33 Stan. L. Rev. 1 (1980); Dix, *Appellate Review of the Decision to Impose Death*, 68 Geo. L.J. 97 (1979). Additionally, the categories of factors which would be used in setting up any statistical model for quantitative analysis, no matter how numerous those factors, would have a natural tendency to become the last word on the subject of proportionality rather than serving as an initial point

of inquiry. After making numerical determinations concerning the number of similar and dissimilar characteristics in the case before it and in other cases in which the death sentence was or was not imposed, a reviewing court might well tend to disregard the experienced judgments of its own members in favor of the "scientific" evidence resulting from quantitative analysis. To the extent that a reviewing court allowed itself to be so swayed, it would tend to deny the defendant before it the constitutional right to "individualized consideration" as that concept was expounded in *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (Burger, C.J., plurality opinion). This is so because, a "close reading of the actual records of cases identified as 'similar' by a quantitative measure may reveal factual distinctions which make them legally dissimilar." Baldus, Pulaski, Woodworth and Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach*, 33 Stan. L.Rev. 1, 68 (1980). Further, the reviewing court would still be required to rely upon a "best estimate" of the factors that actually influenced the sentencing juries. *Id.* at 24-25. Therefore, this Court will not attempt to engage in the systematic and scientific collection of statistical data or its evaluation and analysis through the theory of probability, multiple regression analysis, graphs or the other tools of statistical analysis which are of value to scientists engaged in the physical sciences and dealing with matters other than proportionality review in capital cases.

We do not mean to imply that counsel representing defendants in capital cases on appeal to this Court may not collect, evaluate and analyze such data and argue their conclusions or the conclusions of statistical experts to this Court. Counsel in capital cases are, of course, always free to present arguments concerning such matters to this Court, and we will give them due consideration. In the final analysis, however, when engaging in our statutorily mandated duty of proportionality review in a particular capital case, we will rely upon our own case reports in the "similar cases" forming the pool of cases which we have indicated we use for comparison purposes. Where necessary we also will resort to the records and briefs in those "similar cases."

Further, this Court will not necessarily feel bound during its proportionality review to give a citation to every case in the pool of "similar cases" used for comparison. We have chosen to use *all* of these "similar cases" for proportionality review purposes. The

Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977. *See, e.g., State v. Pinch,* 306 N.C. 1, 38-61, 292 S.E. 2d 203, 230-243 (1982) (Justice Exum dissenting as to sentence.), *cert. denied,* --- U.S. ---, 74 L.Ed. 2d 622 (1982); *State v. Rook,* 304 N.C. 201, 237-249, 283 S.E. 2d 732, 754-761 (1981) (Justice Exum concurring in part and dissenting in part.), *cert. denied,* 455 U.S. 1038 (1982). We believe that the use of these methods for comparison of "similar cases" in our proportionality review "substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury." *Gregg v. Georgia,* 428 U.S. 153, 206 (1976).

[14] Having announced the pool of "similar cases" and the methods of comparison we use, we reach the very serious responsibility of proportionality review in the case before us. We have carefully reviewed the transcript and record in this case together with the briefs and oral arguments. We have also made a comparison of this case with the other cases in the pool of "similar cases" which have been appealed to this Court. The record before us reveals a case in which the one hundred year old victim suffered what can only be described as torture at the merciless hands of a defendant who, after having struck the victim several times and felled her, continued to batter her with two heavy metal clock weights. He then ransacked her home taking what he wanted. At his leisure he returned to the prostrate and aged victim, pulled up her dress, pulled off her underpants, and proceeded to force a mop handle into her vagina in such a fierce and unrelenting manner as to cause her to suffer massive internal injuries including multiple fractures of the sacrum and pubic bones. Having tortured the victim in this manner, the defendant took her property and left her to die in a pool of her own blood. As a result of the accumulation of the numerous wounds inflicted upon her by the defendant, the victim died alone in her home that evening. The record before us reveals a vicious and prolonged murderous assault resulting in a defenseless victim's death which was so brutal and so utterly senseless as to lead us to conclude that the sentence of death imposed in this case is not disproportionate or excessive considering both the crime and the defendant. We so conclude after making a proper comparison of this case to the cases in the pool of "similar cases" which we employ

in proportionality review. Therefore, we decline to exercise our discretion to set aside the sentence of death.

In all phases of the trial below, we find

No error.

Justice FRYE took no part in the consideration or decision of this case.

Justice EXUM dissenting as to sentence.

In this case the trial court, on its own motion and without request from defendant,[1] submitted the following issue to the jury during the sentencing phase: "Does the defendant have a significant history of prior criminal activity?" Because there was plenary, uncontradicted evidence showing that defendant did have a significant history of prior criminal activity,[2] the jury naturally answered this issue "Yes." Thus the jury in effect was

---

1. The record fails to reveal a request from defendant's counsel for the submission of this mitigating circumstance, although defendant's counsel did introduce the evidence of his previous criminal activity. On oral argument defendant's counsel advised the Court that no request for the submission of such an issue was made. I must assume that defense counsel did not request this instruction particularly in the form in which it was given.

2. Evidence of the following convictions, dates and dispositions was introduced:

(1) Simple assault, 15 March 1974, ordered to pay court costs.

(2) Larceny, 24 September 1974, six months suspended sentence with probation for four years, $25 and costs.

(3) Trespassing, 18 July 1975, six months suspended sentence with probation for two years, costs.

(4) Public drunkenness, 19 July 1975, released for time served in jail—4 days.

(5) Two counts of unauthorized use of a vehicle, 6 September 1978, two years imprisonment.

(6) Use of profane language, 11 December 1979, thirty days suspended sentence, $10 and costs.

(7) Damage to real property, 24 July 1980, seven months suspended sentence with probation for three years upon payment of costs, $25 fine and $105 restitution.

(8) Assault on a female, 29 April 1981, thirty days suspended sentence with probation for two years (he was released for 12 days served in jail), costs remitted.

State v. Williams

permitted to consider an additional aggravating circumstance which is not permitted by our statute.

I cannot agree with the majority's position that the result is no different than had the issue been submitted in proper form, *i.e.,* "The defendant has no significant history of prior criminal activity," G.S. 15A-2000(f)(1), and answered "No." First, the issue, absent a request from the defendant and in light of the evidence adduced, should not have been submitted at all. Defendant has the burden of proof on mitigating factors. *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979). Here, defendant failed to carry that burden and apparently conceded as much at his trial. There was, therefore, no basis for the submission of the issue. Second, for a jury to fail to find a mitigating fact is not the same as affirmatively finding a fact which can only be considered aggravating. When the jury is permitted to do this and when the aggravating fact is not permitted by the statute, I think error occurs which requires a new sentencing hearing.

For the reasons stated in my dissent in *State v. Johnson,* 298 N.C. 355, 378, 259 S.E. 2d 752, 766 (1979), I think it was error for the trial judge to fail to instruct the jury upon defendant's request that if it could not agree on a sentence, the court would impose a sentence of life imprisonment.

I vote, therefore, for a new sentencing hearing.

---

(9) Simple assault, 5 June 1981, released for time served in jail—14 days.

Defendant had compiled the above record even though he was only 23 years old at the time of trial. Thus the jury could not have answered the question as posed other than affirmatively.